STATE of South Dakota, Plaintiff
and Appellee,

v.

Levern A. FLOODY, Defendant
and Appellant.

No. 17366.

Supreme Court of South Dakota.

Argued Oct. 23, 1991.

Decided Jan. 22, 1992.

Mark Barnett, Atty. Gen., Sherri Sundem Wald, Asst. Atty. Gen., Pierre, for plaintiff and appellee.

William A. Delaney III, Northern Hills Public Defender's Office, Deadwood, for defendant and appellant.

WUEST, Justice.

This is a criminal case which was tried before a jury. The jury found defendant Floody (Floody) guilty of two counts of rape in violation of SDCL 22–22–1(4). The trial court entered Judgment of Conviction from which Floody appeals. We affirm.

### FACTS

In November 1989, P.C. (Pennie) married W.C. (William). At the time of their marriage, Pennie had a four-year-old son named Kenneth; and William had two children, A.C. age six, and Randy age four. William and Pennie purchased and moved into a home in Lawrence County, South Dakota. The residence had three bedrooms on the main floor and three bedrooms in the basement. Pennie and William shared one of the bedrooms on the main floor. Kenneth and Randy each had a bedroom of their own on the main floor. A.C.'s bedroom was in the basement.

Shortly after the C.s began living in their new home, numerous friends and family began to periodically move in and out of their residence. Floody was one of the family friends who came to live with the C.s. Floody came at the invitation of William sometime in the first or second week of December 1989. When Floody arrived, the C.s allowed him to use the pantry area in the basement as his bedroom.

In February 1990, William was sentenced to one year in the South Dakota State Penitentiary as a result of his guilty plea to possession of a controlled substance. Prior to leaving for prison, William asked Floody to stay with his family and keep an eye on things. Floody was a good family friend who seemed to get along well with the children. A.C. would sit on Floody's lap, curl up under his arm, and watch T.V. A.C. called Floody her "Uncle L.A." and considered him her boyfriend.

On Saturday, March 17, 1990, Pennie was leaving the laundry room when she overheard A.C. tell Randy, "You can take them off if you want" while playing with Randy in his bedroom. Hearing nothing else, Pennie opened the door, and walked into Randy's bedroom. Pennie observed Randy on top of A.C. A.C.'s pants were unzipped and unsnapped, and Randy was tugging on her pants. Not knowing how to handle the situation, she asked a friend, Kathy, to see if she could find any helpful information.

Pennie eventually decided to discuss the incident with A.C. A.C. was nervous and frightened. Pennie asked A.C. if anyone had ever touched her "private parts."[1] At first, A.C. denied anyone had, but began fidgeting with her fingers. After Pennie assured A.C. she was not at fault, A.C. mentioned Floody's name. Pennie asked A.C. what Floody had done. A.C. said he "rubbed it," meaning her private parts, and stuck his finger "inside of her." A.C. also stated Floody had "sucked on her," and Floody made her "suck on him" although she did not want to. A.C. then began crying. When Pennie asked A.C. when this happened, A.C. responded, "It happens all the time, mommy."

Later, Pennie asked Kathy to talk with A.C. while Pennie listened. Kathy asked A.C. to tell her what had happened. Hesi-

---

1. The terminology "private parts" was used in a movie Pennie had purchased for the children called "Too Smart For Strangers," which uses Winnie the Pooh characters to encourage children not to talk with strangers, and to discuss the concepts of good and bad touch.

tant at first, A.C. told Kathy that Floody "had sucked on her." A.C. told Kathy she had "to suck on Floody" and "white stuff that tasted yucky came out." A.C. also told Kathy that Floody "stuck his tongue in her mouth." Pennie overheard A.C. tell Kathy "white stuff came out and it tasted yucky." Pennie called the police and reported the incident.

Pennie brought A.C. to the Social Services Office where A.C. was interviewed by Social Worker Pam Knuppe (Knuppe) and Deputy Sheriff Pat Humphrey (Humphrey). Knuppe primarily asked the questions, and Humphrey took notes during the interview. Pennie was not present during the interview.

A.C. told Knuppe and Humphrey that Floody lived with her family. A.C. stated she liked Floody and knew he loved her. A.C. acknowledged and demonstrated that she understood what her "private parts" were. When asked if she had ever been touched in or on her "private parts," A.C. answered "yes, L.A., he always does it and he's 44." A.C. indicated by pointing with her finger Floody had touched her between her legs. When questioned about other touching, A.C. replied Floody touched her chest and bottom with his hand every few days when it was dark outside. A.C. told the interviewers she was frightened when Floody touched her, and had told Floody she did not want to do it.

A.C. stated Floody touched her in his bedroom and in the shop. A.C. described to Knuppe and Humphrey how Floody would bring her into his bedroom and lay her on his bed. Floody would take her pants and underpants off and then rub her between her legs and on her "hiney" with his hand. A.C. stated Floody would touch her "on the inside" with his "pinky."

A.C. also described the touching which occurred in the shop. A.C. stated she was sitting down and Floody was on his knees by the chair. Again, A.C. stated Floody touched her "inside" with his "pinky." She stated sometimes she took her own clothes off, and sometimes Floody took them off. A.C. was able to describe the sex acts in detail, recounting what she had described to Pennie and Kathy.

Knuppe asked A.C. when the touching by Floody occurred. A.C. thought one time it happened before Christmas. A.C. did not know the last time Floody touched her, but she thought it was on a weekend, while Pennie was visiting William in prison.[2] She stated the touching occurred when Pennie was away and she was left with a babysitter. A.C. denied anyone else had ever touched her in the manner Floody did.

At trial, A.C. testified: she knew Floody, he had previously lived at her house, and he slept in the basement in a bedroom close to hers. A.C. identified her "private parts" as being between her legs. She described how Floody touched the inside of her "private parts" with his "pinky finger" and his mouth even though she did not want him to. She further testified: she saw Floody's "private parts"; Floody touched her mouth with his "private parts"; Floody would make her "suck on his private parts" even though she did not want to; when she would "suck on his private parts, white stuff would come out that tasted yucky"; and Floody sucked on her "private parts." Again, A.C. denied that anyone other than Floody had ever touched her private parts. A.C. did not know how many times Floody touched her private parts, but she knew "it happened a lot of times."

Floody testified on his own behalf. He acknowledged he arrived in South Dakota the second week of December and moved into the C. family residence; he had a bedroom in the basement; and A.C. felt very close to him and had told him she loved him. Floody also testified that shortly after William was incarcerated, he was out of state for approximately one week. Floody denied he ever touched A.C. in an improper sexual manner or molested her in any way.

Floody was convicted of two counts of

---

2. It was later established Pennie had visited William on the weekends of February 23–26 and March 9–12, the weekend before the incident involving Randy and A.C.

rape in violation of SDCL 22–22–1(4).[3] Floody appeals raising the following issues:

(1) Whether the indictment, by failing to set out the exact dates, times and places of the purported rapes violated Floody's right to due process and right not to be put in double jeopardy.

(2) Whether the trial court in admitting expert testimony regarding child sexual abuse syndrome improperly admitted expert testimony that implied A.C. was telling the truth.

(3) Whether the trial court erred in supplying for the jury during its deliberation the definitions of "fellatio" and "cunnilingus."

(4) Whether the trial court properly admitted certain statements made by A.C. under exceptions to the hearsay rule.

(5) Whether the trial court improperly admitted evidence of Floody's other crimes or bad acts.

(6) Whether statutes permitting an adversarial hearing before an expert is appointed to assist an indigent defendant in his defense violated Floody's right to due process and to equal protection of the law.

We affirm.

## I.

■ Floody contends the indictments on which he stood trial were so vague he could not properly prepare for trial and assert a conviction as a bar to further prosecution. An indictment is sufficient if it "contains the elements of the offense charged such that it apprises the defendant with reasonable certainty of the accusations against him, and it must enable him to plead an acquittal of conviction as a bar to future prosecutions for the same offense." *State v. Basker*, 468 N.W.2d 413, 416 (S.D.1991). *Accord State v. Wurtz*, 436 N.W.2d 839, 843 (S.D.1989); *State v. Logue*, 372 N.W.2d 151, 155 (S.D.1985); *State v. Swallow*, 350 N.W.2d 606, 608 (S.D.1984).

The indictment under which Floody was charged, included two counts of rape in the first degree in violation of SDCL 22–22–1(4).[4] The defense filed a motion for bill of particulars. In its response, the State informed Floody the alleged incidents of rape took place between the first and second week of December 1989 through March 17, 1990. The State also indicated the specific parts of A.C.'s body involved were the mouth and vagina. Floody filed a motion to dismiss alleging the indictment was so vaguely drawn that it violated his right to due process and right not to be placed in double jeopardy, rights secured to him by the fifth and fourteenth amendments of the United States Constitution[5] and article VI, sections 2 and 9 of the South Dakota Constitution.[6]

### A. *Double Jeopardy.*

We addressed the same double jeopardy argument in a similar factual scenario in *Wurtz*. Wurtz was charged with four separate counts of sexual contact with a child, all alleged to have occurred between December 15, 1986 and March 1, 1987. The

---

**3.** SDCL 22–22–1(4) (1988) (amended 1991) provides in pertinent part:

Rape is an act of sexual penetration accomplished with any person other than the actor's spouse under any ... of the following circumstances:

. . . . .

(4) Where the victim is less than ten years of age[.]

SDCL 22–22–2 (1988) provides in pertinent part:

Sexual penetration means an act, however slight, of sexual intercourse, cunnilingus, fellatio, anal intercourse, or any intrusion, however slight, of any part of the body or of any object into the genital and anal openings of another person's body.

**4.** Counts I and II were identical. They stated:

That between or about the dates of October 1, 1989, and March 20, 1990, within Lawrence County, South Dakota, Levern Alfred Floody did accomplish an act of sexual penetration with a person other than the actor's spouse, where the victim was less than ten years of age at the time, to-wit: did accomplish an act of sexual penetration with A.C., age 6. Contrary to SDCL 22–22–1(4).

**5.** The fifth amendment of the United States Constitution states: "[N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb...." U.S. Const. amend. V.

**6.** South Dakota's Constitution provides: "No person shall ... be twice put in jeopardy for the same offense." S.D. Const. art. VI, § 9.

*Wurtz* information merely set forth the dates between which the acts allegedly occurred and the statutory language of which the violation consisted. *Wurtz,* 436 N.W.2d at 841. The only distinguishing feature of the four counts was a caption at the top of each count stating "(FIRST IN-CIDENT)," "(SECOND INCIDENT)," etc. The *Wurtz* court noted the record revealed a separate factual scenario in each of the four incidents. The jury instructions required individual decisions on each count and a separate decision on guilt or innocence as to each. The court held, "[a] party may proceed with proof, outside of the information itself, to determine the charge which the conviction was based upon in order to raise it as a bar to a subsequent prosecution." *Id.* at 843 (citing *Cowan v. State,* 140 Neb. 837, 839–40, 2 N.W.2d 111, 113 (1942)).

■ In the case before us, A.C., while being interviewed by Humphrey and Knuppe, stated one incident occurred prior to the Christmas of 1989, and one occurred on a weekend while Pennie was away visiting William in prison (sometime after February 12, 1990). In addition, A.C. stated that at least one incident occurred in the shop, and at least one occurred in Floody's bedroom. This information was provided to Floody at a pretrial motion. Thus, based upon information in the record, at least two separate and distinct incidents occurred. In addition, the jury was instructed there were two alleged separate occasions of rape, both of which the State was required to prove independently. The trial court required a separate decision on both counts. We hold against Floody on his double jeopardy argument.[7]

### B. *Due Process.*

■ The time of the occurrence is not a material element in statutory rape as the elements of that offense are not "time dependent." *State v. Sysinger,* 25 S.D. 110, 112, 125 N.W. 879, 880 (S.D.1910). *See Basker,* 468 N.W.2d at 416; *Swallow,* 350 N.W.2d at 608. In general, the State need not allege dates with specificity where time is not a material element, SDCL 23A–6–9 (1988); *Basker,* 468 N.W.2d at 416; *Swallow,* 350 N.W.2d at 608; *Commonwealth v. Niemetz,* 282 Pa.Super. 431, 422 A.2d 1369, 1372–73 (1980); *State v. Case,* 357 So.2d 498, 499 (La.1978), or where time is not basic to a defense presented in the case, *e.g., People v. Long,* 55 Ill.App.3d 764, 13 Ill.Dec. 288, 295, 370 N.E.2d 1315, 1322 (1977).

Floody claimed he was not provided sufficient notice to establish a defense. In *Wurtz,* the defendant made the same claim. The *Wurtz* court noted that investigative reports were furnished to Wurtz before trial to apprise him of the specific acts the State was relying on to prove the four individual counts. He was aware of what he was charged with and was apprised of the state's evidence before trial. Wurtz was able to prepare a defense, even though the indictment did not contain "all of the lurid details." *Wurtz,* 436 N.W.2d at 843–44. The *Wurtz* court held lack of specificity as to time is no grounds for reversal, relying on *Swallow* where this court noted the nature of sex offenses involving minor children often precludes certainty with respect to time, especially where reporting of the incident is delayed. *Id.* at 842–43 (quoting *Swallow,* 350 N.W.2d at 608). We followed the same rationale in *Basker,* where we stated:

> Although an information should be as specific as possible with respect to time, it is not always possible to know with certainty when an offense occurred. This is especially true in sexual molesta-

---

7. This conclusion is supported by *Grady v. Corbin,* 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990) which held:

[T]he Double Jeopardy Clause bars any subsequent prosecution in which the government, to establish an essential element of an offense charged in that prosecution, will prove conduct that constitutes an offense for which the defendant has already been prosecuted....

The critical inquiry is what conduct the State will prove[.]

*Grady,* 495 U.S. at 521, 110 S.Ct. at 2093, 109 L.Ed.2d at 564. Under the *Grady* holding, Floody's conviction would prevent retrial based on any incidents of rape between the second week of December 1989 and March 17, 1990 occurring in either the shop or in Floody's bedroom.

tion cases involving a minor victim who does not immediately complain to authorities. Under these circumstances, specificity of time is not *always* required in an indictment.

*Basker*, 468 N.W.2d at 417 (emphasis added) (citing *Swallow*, 350 N.W.2d at 608).

In this case, Floody testified he was out of state during a one week period shortly after William was incarcerated. A.C. stated one of the rape incidents occurred on a weekend while Pennie was away visiting William in prison. Floody argues vagueness of the charges as to dates and times of the incidents deprived him of an opportunity to invoke a viable alibi defense. We disagree.

Floody presented no evidence of any alibi which existed prior to Christmas. As to the rape which allegedly occurred after William was incarcerated, a closer question is presented. Some support for Floody's position exists.[8] In *Basker*, the indictment alleged the defendant had improperly touched the victim sometime within a two-month time reference. Basker argued the allegations were so vague his right to prepare an adequate defense of voluntary intoxication was violated. Rejecting that argument, we held the lack of specific dates did not prohibit Basker from asserting voluntary intoxication as a defense, because intoxication is not a defense which is "time-dependent," inferring that an alibi defense is time dependent. *Id.* at 417. *But see* 65 Am.Jur.2d *Rape* § 52 (1972); *State v. Goddard*, 69 Or. 73, 138 P. 243, 246–47 (1914) (defendant cannot make precise date charged in the indictment material by giving notice that his defense includes an alibi). Nonetheless, we conclude the State's inability to provide a more specific time period concerning the rape which occurred after William's incarceration did not prejudice Floody's defense.

In *State v. Cochrun*, 434 N.W.2d 370, 372–73 (S.D.1989), we held "on or about" language in the indictment did not prejudice Cochrun's alibi defense where the crime was alleged to have been committed within a two day period and defendant had an alibi for only part of one day. "Alibi evidence must show that the accused could not have committed the alleged crime, because at the time of its commission he was at a place other than where such offense was committed." *Id.* (quoting *State v. Nelson*, 310 N.W.2d 777, 779–80 (S.D.1981)). Pennie's testimony limited the time period of the second offense to one of two weekends, February 23–26 and March 9–12. Floody testified he was out of town one week late in February. Floody had no alibi for the weekend in March. Floody was convicted despite his "alibi." Floody's "alibi" simply was not sufficient to convince the jury. *See Cochrun*, 434 N.W.2d at 373. An alibi "to be successful must cover the entire time when [appellant's] presence was required for accomplishment of the crime.... [A] purported alibi that leaves it possible for the accused to be the guilty person is no alibi at all." *Nelson*, 310 N.W.2d at 780 (citations omitted).

## II.

Floody's next contention concerns expert testimony regarding "child sexual abuse syndrome." At trial, a defense witness posited the interviews of A.C. may have been suggestive or leading and a proper interview technique would have recorded the interviews rather than relying on Deputy Humphrey's notes. Kathy Peil, a certified social worker, testified in rebuttal the interview techniques used in A.C.'s case were acceptable:

> ... The fact of the matter is, in the interview by the sheriff's deputy and the Department of Social Services sometimes [A.C.] would—They would ask her question [sic] and she would say, no, that

8. In *State v. Gingell*, 7 Ohio App.3d 364, 455 N.E.2d 1066 (1982), the court opined in dicta where a "defendant had been imprisoned or was indisputably elsewhere during part but not all of the intervals of time set out in the indictment[,] the inability of the state to produce a greater degree of specificity would unquestionably prejudice the defense." *Id.* 455 N.E.2d at 1071 (dicta). *See also Long*, 13 Ill.Dec. at 295, 370 N.E.2d at 1322, *State v. Roberts*, 101 Idaho 199, 610 P.2d 558, 559 (1980).

wasn't the case. There have been—there was at least one example I'm thinking of where the—when what she said was spontaneous. In other words, no one asked a question and she volunteered some information. I think there's more than one, but I'm recalling the one at the end of the interview with the sheriff's deputy and the Department of Social Services where as her mother came into the room she turned to her mother and spontaneously said something to the effect, he sucked me, Mommy.

Floody argues this testimony implied A.C. was telling the truth and thereby invaded the province of the jury to determine the witness' credibility.

■ "[T]he trial court has broad discretion concerning the qualification of experts and the admission of expert testimony. The trial court's decision as to such matters will not be reversed on appeal absent a clear showing of an abuse of that discretion." *Logue*, 372 N.W.2d at 156. *Accord State v. Spaans*, 455 N.W.2d 596, 598–99 (S.D.1990); *State v. Bachman*, 446 N.W.2d 271, 275 (S.D.1989).

In *Bachman*, we held "the trial court did not err in admitting expert testimony concerning the traits and characteristics typically found in sexually abused children, characteristics or emotional conditions observed in the victims, and opinion testimony that the victim['s] allegations were truthful." *Bachman*, 446 N.W.2d at 276 (citing *State v. Meyers*, 359 N.W.2d 604 (Minn.1984); *State v. Middleton*, 294 Or. 427, 657 P.2d 1215 (1983); *State v. Kim*, 64 Haw. 598, 645 P.2d 1330 (1982)). *Cf. Spaans*, 455 N.W.2d at 599. However, in *McCafferty*, decided the same year as *Bachman*, we stated the general rule "is that one witness may not testify as to another witness' credibility or truth-telling capacity because such testimony would invade the exclusive province of the jury to determine the credibility of a witness." *McCafferty v. Solem*, 449 N.W.2d 590, 592 (S.D.1989). Yet, we stated "[a]n expert may testify as to certain characteristics of abused children and may even compare those characteristics to actions of a particu-

lar victim." *Id.* (citing *United States v. Saint Pierre*, 812 F.2d 417 (8th Cir.1987)). In a situation where a child claims to have been sexually abused, and exhibits characteristics typical of such children, an expert's testimony regarding those traits would imply the victim was telling the truth.

■ In the case before us, Ms. Peil did not directly testify that A.C.'s statements were truthful. She testified some of A.C.'s statements contradicted what the interviewer was saying and at least one statement was made spontaneously indicating A.C. was not being influenced by the interviewer. This testimony implied A.C.'s statements were accurate. We do not believe Ms. Peil's testimony invaded the province of the jury to determine A.C.'s credibility. Rather, her testimony was helpful to the jury in deciding whether the interviewing techniques utilized by the Department of Social Services were suggestive or leading. The trial court did not abuse its discretion in permitting the testimony.

### III.

■ During its deliberation, the jury asked for a dictionary. In response to the request, the trial court contacted counsel for the State and counsel for Floody. The court and counsel agreed the jury should not be given a dictionary. However, counsel agreed the court could inquire of the jury what term it wished to have defined. The jury responded: "Please define fellatio and cunnilingus."

The trial court inquired of counsel how they wished to respond to the jury's question. Floody's counsel opposed any additional response. The State argued both terms should be defined. Using the New American Medical Dictionary and Health Manual as his reference, the trial court defined fellatio, cunnilingus and genitals/genitalia.

On appeal, Floody argues the trial court abused its discretion by responding to the jury's questions. The trial court fully complied with the dictates of SDCL 15–6–51(a), 15–6–51(b) (1984) and 23A–25–8 (1988). The definitions were reduced to writing and

settled with counsel. The decision whether to supply further instruction rests within the sound discretion of the trial court. *State v. Holtry*, 321 N.W.2d 530, 531 (S.D. 1982). Given the relevancy of the definitions to the case, we conclude the trial court did not abuse its discretion.

## IV.

■ Floody's fourth contention concerns hearsay statements made by A.C. to Pennie and Kathy shortly after the incident between A.C. and Randy, and to Knuppe and Humphrey. Floody asserts the statements should not have been admitted by the trial court. The State notified the defense it intended to admit the statements. Prior to trial, the trial court ruled the statements made to Pennie and Kathy would be admitted pursuant to both the excited utterance exception to the hearsay rule, SDCL 19–16–6 (Rule 803(2)) (1987),[9] and the "tender years" statute, SDCL 19–16–38 (1987). The trial court ruled the statements made to Knuppe and Humphrey were admissible pursuant to the "tender years" statute. We note at the outset, "this court will disturb the decision of the trial court [regarding admission of evidence] only upon a showing of abuse of discretion." *State v. Bawdon*, 386 N.W.2d 484, 486 (S.D.1986) (citing *State v. Percy*, 80 S.D. 1, 117 N.W.2d 99 (1962)).

### A. Statement Admitted Pursuant to the "Excited Utterance Exception."

■ To fit within the exception, a hearsay statement must: (1) relate to a startling event or condition, and (2) be made by the declarant while under the stress of excitement caused by the event or condition: The reliability of the statement stems from the influence of the event that overrides any reflective capability essential for fabrication. *State v. Bult*, 351 N.W.2d 731, 735–36 (S.D.1984). Thus, "[t]he critical inquiry is whether the statements were made while the declarant was still under

the influence of the experience." *Logue*, 372 N.W.2d at 159.

Floody argues, since it was never established with any specificity as to when the sexual abuse took place, it was impossible to make any realistic determination as to whether A.C. was still under the influence of the startling event when she made the statements to Pennie and Kathy. The trial court noted the last incident of abuse may have occurred several days or more previous to A.C.'s statement. In concluding A.C.'s statements were made while under the influence of the acts committed upon her, the trial court noted: Pennie observed A.C. engaged in inappropriate sexual conduct and confronted her, thereby creating a stressful situation and placing A.C.'s reflective processes in abeyance; A.C. was reluctant and afraid, and she began crying as she told Pennie of her ordeal.

■ We agree with the trial court these findings indicate A.C. was under stress; however, this was not stress caused by the exciting event, but was stress caused by recounting that event. We are hesitant to rule that A.C.'s statements fall within the excited utterance exception when the length of time between the startling event and the statement is unknown. *See* 4 J. Weinstein, M. Berger, *Weinstein's Evidence* ¶ 803(2)[1], at 803–86 n. 4 (1991) (citing 6 Wigmore, *Evidence* § 1747 at 135 (3d Ed.1940)). Nonetheless, because the statements were properly admitted pursuant to the tender years statute, any error was harmless. *See State v. Michalek*, 407 N.W.2d 815, 818–819 (S.D.1987); *State v. Davis*, 401 N.W.2d 721, 725 (S.D.1987).

### B. Statements Admitted Pursuant to South Dakota's Tender Years Statute.

In addition to admitting A.C.'s statements to Pennie and Kathy under the excited utterance exception, the trial court also admitted the statements under South Dako-

**9.** SDCL 19–16–6 provides:

A statement relating to a startling event or condition made while the declarant was under

the stress of excitement caused by the event or condition, is not excluded by § 19–16–4, even though the declarant is available as a witness.

ta's tender years statute, SDCL 19–16–38.[10] That statute "provides for admission of hearsay statements of a youth victim of a sex crime only in the event [the] trial court finds that the time, content, and circumstances of the statement provide sufficient indicia of reliability." *State v. Schoenwetter*, 452 N.W.2d 549, 550 (S.D.1990); SDCL 19–16–38(1). Since A.C. testified at trial, the only question presented is whether her previous statements bore sufficient indicia of reliability to merit admission.

■ In *McCafferty*, we set forth factors the trial court should consider in determining whether the hearsay statements are sufficiently reliable to be admitted under SDCL 19–16–35 (the residual hearsay exception which also requires a showing of reliability): "[T]he age and maturity of the child, the nature and duration of the abuse, the relationship of the child to the offender, the reliability of the assertions, and the reliability of the child witness." *McCafferty*, 356 N.W.2d at 164. In *Schoenwetter*, we adopted those considerations in determining trustworthiness under the tender years statute. *Schoenwetter*, 452 N.W.2d at 550–51. Other factors which should be considered are probable motivations of the declarant, circumstances under which the statement is made, *State v. Thompson*, 379 N.W.2d 295, 297–98 (S.D. 1985); *State v. O'Brien*, 318 N.W.2d 108, 112 (S.D.1982), spontaneity, consistent repetition, mental state of the declarant, use of terminology unexpected of a child of similar age,[11] and lack of motive to fabricate, *Idaho v. Wright*, 497 U.S. 805, 110 S.Ct. 3139, 3150, 111 L.Ed.2d 638, 656 (1990). "The unifying principle is that these factors relate to whether the child declarant was particularly likely to be telling the truth when the statement was made." *Id.*

■ Prior to admitting A.C.'s statements to Kathy and Pennie, the trial court properly considered all of the above factors and concluded A.C.'s statements bore sufficient indicia of reliability to be admitted via SDCL 19–16–38. We agree. A.C. was confronted by her stepmother while engaged in inappropriate sexual behavior which had never occurred previously; she was questioned while her ability to reflect was in abeyance; she was visibly upset to the point of tears; she repeated the story to Kathy and it was substantially consistent; she related sexual experiences only an abused child would have been subjected to in detail beyond the capacity of children of A.C.'s age to make up; there was minimal prompting by Pennie or Kathy; the time between discussions with Pennie and Kathy were spent at a birthday party where A.C. had little time to reflect; and Floody occupied a position of superiority over A.C., being a long-time friend of her father's, living in the same household and having a close relationship with A.C. Finally, we can conceive of no possible motive A.C. would have to make up such a story. A.C. felt affection for Floody. Pennie explained to A.C. that Floody would go to jail for a long time as a result of his actions. We point out Floody himself has asserted no possible motive on A.C.'s part to be anything other than truthful. All of these factors indicate A.C.'s statements were trustworthy.

Statements made by A.C. to Knuppe and Humphrey were also admitted pursuant to the tender years statute. The same factors apply in determining whether those statements were sufficiently trustworthy. We agree with the trial court they were. In

---

**10.** SDCL 19–16–38 provides in pertinent part:

A statement made by a child under the age of ten describing any act of sexual contact or rape performed with or on the child by another, not otherwise admissible by statute or court rule, is admissible in evidence in criminal proceedings against the defendant or in any proceeding under chapter 26–8 in the courts of this state if:
(1) The court finds, in a hearing conducted outside the presence of the jury, that the time, content and circumstances of the statement provide sufficient indicia of reliability; and
(2) The child either:
(a) Testifies at the proceedings; or
(b) Is unavailable as a witness.

**11.** The *McCafferty* court specifically noted "[a] young child is unlikely to fabricate a graphic account of sexual activity because such activity is beyond the realm of his or her experience." *McCafferty*, 356 N.W.2d at 164.

addition to most of the above factors, we note: consistency of the statements when compared to statements made to Pennie and Kathy, lack of any evidence of prompting or manipulation of A.C. prior to the interview, and the trial court's finding that none of the interviewing techniques were unduly suggestive.[12] Under the "totality of circumstances" we conclude A.C. was particularly likely to be telling the truth at the time the statements were made to Pennie, to Kathy, and to Knuppe and Humphrey. *Wright,* 497 U.S. at ——, 110 S.Ct. at 3149, 111 L.Ed.2d at 655–56. For all the above reasons, we do not believe the trial court abused its discretion in admitting A.C.'s out-of-court statements.[13]

### V.

Prior to trial, the State filed a Motion for Admission of Defendant's Other Acts pursuant to SDCL 19–12–5 [Fed.R.Evid. 404(b)] (1987).[14] The "other acts" consisted of instances of sexual contact and acts of sexual penetration involving A.C. other than those with which Floody was charged. The State sought to introduce those acts as evidence of "intent, motive, a common plan or system of criminal action and a continuation of offenses in the commission of sexually abusive acts."

### A. Uncharged Acts of Sexual Penetration and Contemporaneous Acts of Sexual Contact.

The trial court, in its memorandum opinion, concluded evidence of continuous acts of sexual penetration and contemporaneous acts of sexual contact was direct or "intrinsic" evidence of the crime charged, and therefore, did not constitute "other acts" within the meaning of SDCL 19–12–5. In addition, the court concluded that it would be "very confusing, traumatic and impossible" for A.C. to limit her testimony to two incidents of sexual penetration without being able to discuss the complete sequence of sexually abusive acts committed by Floody against her "all of the time."

■ We agree SDCL 19–12–5 does not exclude the uncharged instances of sexual penetration that A.C. testified to. SDCL 19–12–5 [Fed.R.Evid. 404(b)] presupposes the existence of "other crimes, wrongs or acts." The situation here presented a continuing series of similar actions, in similar circumstances, perpetrated on the same victim by the same individual. Although Floody was charged with only two counts of rape, A.C. testified the rapes occurred "all the time." The acts were all part of a course of conduct. As such, proof of the other instances of rape were not offered as proof of "other acts" to prove Floody probably committed the acts charged. Instead they constituted direct proof of the crimes charged. Such evidence is probative to show the probability of the commission of the act charged and to corroborate the testimony of the victim. *Sysinger,* 125 N.W. at 880–81; *State v. Crossman,* 229 Kan. 384, 624 P.2d 461, 464 (1981); *State v. Austin,* 285 N.C. 364, 204 S.E.2d 675, 677

---

**12.** Floody points out that during the interview, Knuppe introduced the word "pinkie finger" to A.C. A.C. used that term at trial to describe the finger Floody violated her with. However, A.C. had already shown Knuppe which finger Floody used. We find Floody's argument that A.C.'s adoption of the word "pinkie" destroyed the statement's reliability specious.

**13.** Floody argues the Knuppe–Humphrey interview lacked sufficient indicia of reliability because, among other things, it was not videotaped. In *Idaho v. Wright,* the Supreme Court specifically declined to adopt videotaping as a requirement of interviewing sexually abused victims in order to satisfy the accused's right to confront his accuser. *Wright,* 497 U.S. at ——, 110 S.Ct. at 3148, 111 L.Ed.2d at 654. Instead, that Court looked to the "totality of the circumstances," surrounding the interview and the factors set out supra. *Wright,* 497 U.S. at ——, 110 S.Ct. at 3149–50, 111 L.Ed.2d at 655–56. The wisdom of the *Wright* Court's conclusion is indicated by a letter written to the trial court, wherein a mental health professional stated videotaping interviews is not always proper in child sexual abuse cases as it may interfere with developing a rapport between the victim and the professional.

**14.** SDCL 19–12–5 (Rule 404(b)) (1987) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

(1974). *See also United States v. Towne,* 870 F.2d 880, 886 (2nd Cir.), *cert. denied,* 490 U.S. 1101, 109 S.Ct. 2456, 104 L.Ed.2d 1010 (1989) (alternative holding: "evidence of uncharged criminal activity is not considered 'other crimes' evidence if it 'arose out of the same transaction or series of transactions as the charged offense....' "); *United States v. Weeks,* 716 F.2d 830, 832 (11th Cir.1983); 22 C. Wright, K. Graham, *Federal Practice and Procedure* § 5239, at 445 (1978); E. Imwinkelreid, *Uncharged Misconduct Evidence;* § 2.10 (1984). The trial court did not abuse its discretion in admitting evidence of the continuing nature of the sexual penetration acts.

■ Evidence of sexual contact which occurred during the rape incidents was also properly admitted by the trial court. In some cases, it is quite impossible to prove one crime without revealing other crimes. In such cases, SDCL 19-12-5 is not implicated because "other" acts evidence is not being introduced. Rather such evidence constitutes part of the circumstances of the charged crime. *State v. Smith,* 477 N.W.2d 27, 33-34 (S.D.1991); *State v. Burtts,* 81 S.D. 150, 156, 132 N.W.2d 209, 211-12 (1964) (evidence of another crime explained police officer's presence in charge of assault with a dangerous weapon). *See also* 2 *Weinsteins Evidence, supra,* ¶ 404(10), at 404-77,-79; Imwinkelreid, *supra,* § 6.21-6.24.

The Eighth Circuit Court of Appeals has repeatedly addressed this issue subsequent to the enactment of Fed.R.Evid. 404(b) (the equivalent of SDCL 19-12-5). In *United States v. Bettelyoun,* 892 F.2d 744, 746-47 (8th Cir.1989), the Eighth Circuit held testimony regarding an assault perpetrated by the defendant on another victim approximately one hour before a murder was an "integral part of the crime charged, and as such was not governed by [Fed.R.Evid. 404(b) ]." Similarly, in *United States v. Tate,* 821 F.2d 1328, 1331 (8th Cir.), *cert. denied,* 484 U.S. 1011, 108 S.Ct. 712, 98 L.Ed.2d 662 (1987), the court held evidence of the shooting of a state trooper was an integral part of a prosecution for weapons violations because it was necessary to explain to the jury how the defendant's vehicle came to be searched. The *Tate* court explained:

This court has ... approved the admission of other crimes where such evidence is 'so blended or connected' with the one[s] on trial ... that proof of one incidently involves the other[s]; or explains the circumstances; or tends logically to prove any element of the crime charged. *Id.* (quoting *United States v. Bass,* 794 F.2d 1305, 1312 (8th Cir.1986)). *See also Towne,* 870 F.2d at 886; *United States v. Robbins,* 613 F.2d 688, 694, 55 A.L.R.Fed. 481 (8th Cir.1979); *Carter v. United States,* 549 F.2d 77, 78 (8th Cir.1977) ("res gestae" rule is well recognized exception to 404(b)); *Crisp v. State,* 667 P.2d 472, 474 (Okla.Crim.App.1983) (act of sodomy performed immediately prior to rape admissible as part of "res gestae"); *Allan v. State,* 92 Nev. 318, 549 P.2d 1402, 1403 (1976) (in prosecution for performing fellatio with minors, evidence of other acts committed with the same boys admissible as part of the "res gestae").

The trial court faced a similar scenario here. Because of her age, A.C. was not able to separate the acts of rape from the acts of sexual contact accompanying the rape. She was only able to testify the rapes occurred on a regular basis and included acts constituting sexual contact. Proof of the rape incident necessarily involved proof of sexual contact. Thus, evidence of the sexual contact accompanying the acts of rape were properly admitted without invoking SDCL 19-12-5.

### B. *Other Noncontemporaneous Sexual Contact Evidence.*

■ Regarding the acts of sexual contact which may have occurred separate from the rape incidents, the trial court admitted evidence of those acts pursuant to SDCL 19-12-5 as "other acts." The trial court concluded evidence of sexual contact committed by Floody on A.C. during the same time period; in the same place; and under similar factual situations, although extrinsic to the crime charged (and therefore "other acts" within the meaning of SDCL 19-12-5), would show a continuous

"plan or system" of criminal action and would circumstantially establish an intent on Floody's part to carry out the crimes charged in the indictment. The trial court determined the probative force of the sexual contact evidence was not substantially outweighed by its prejudicial effect.

The trial court instructed the jury it could consider the "other acts" of sexual contact only to determine whether Floody had a plan or system of continuous criminal action in committing the charged crime of rape. The court instructed the jury that the other acts could not be considered to prove Floody was a person of bad character, or that he had a disposition to commit crimes.

> In ruling on the admissibility of evidence of other crimes, wrongs, or acts, a trial court must first determine relevancy. 'Any fact that tends to connect an accused with the commission of a crime is relevant and has probative value. Such other incidents are material if they show a plan or system of criminal action and acts constituting continuous offenses.'

*State v. Means*, 363 N.W.2d 565, 568 (S.D. 1985) (citations omitted). *Accord State v. Dickey*, 459 N.W.2d 445, 449 (S.D.1990); *State v. Sieler*, 397 N.W.2d 89, 92 (S.D. 1986). If the trial court determines the evidence is relevant, it must determine "whether the probative value of the evidence is substantially outweighed by its prejudicial effect ... a question left to the sound discretion of the trial court [whose] decision will not be disturbed absent a clear abuse of discretion." *Basker*, 468 N.W.2d at 415–16. *Accord Dickey*, 459 N.W.2d at 449. For the following reasons, we do not believe the trial court abused its discretion in admitting testimony regarding Floody's acts of sexual contact which may not have been contemporaneous with the acts of sexual penetration.

In *State v. Roden*, we held that relevant "evidence of other wrongs or acts is admissible for the limited purposes of proving motive, opportunity, intent, preparation, *plan*, knowledge, *and a course of continuous criminal action." State v. Roden*, 380 N.W.2d 669, 671 (S.D.1986) (emphasis added) (where defendant was charged with rape, specific incidents of sexual contact related by another child witness were admissible to indicate common design or scheme). *Accord Sieler*, 397 N.W.2d at 93. In *Sieler*, the trial court admitted evidence that a father had sexually molested his daughter on numerous occasions while she lived with him in Michigan. The father was convicted of sexual contact with a minor, which incident occurred in Mitchell. Like the case before us, the other acts of sexual contact occurred continuously, both while the victim and Sieler lived in Michigan and while they lived in Mitchell. The *Sieler* court held: "[i]n this case, it is clear that the bad acts were properly admitted to prove ... plan, ... and obviously 'a course of continuous criminal action.'" *Sieler*, 397 N.W.2d at 93 (quoting *Roden*, 380 N.W.2d at 671).

Here, the sexual contact evidence was highly probative in showing a plan or course of continuous criminal activity. When Pennie was away, Floody would commit acts of sexual contact and rape. These acts always involved the same perpetrator and the same victim. The contact evidence showed Floody's motive to satisfy his sexual desires by committing acts of sexual penetration on A.C.

We also agree with the trial court, the sexual contact evidence's probative value was not substantially outweighed by its potential to unduly prejudice. The court did not abuse its discretion by admitting evidence of sexual contact which may have occurred separate from the acts of rape.

## VI.

In his final contention, Floody argues SDCL §§ 19–15–9 [15] and 19–15–10 [16] are

---

**15.** SDCL 19–15–9 (Rule 706(a)) (1987) provides:
Whenever, in a civil or criminal proceeding, issues arise upon which the court deems expert evidence is desirable, the court, on its own motion, or on the request of either the state or the defendant in a criminal proceeding, or of any

party in a civil proceeding, may appoint one or more experts, not exceeding three on each issue, to testify at the trial.

**16.** SDCL 19–15–10 (Rule 706(b)) (1987) provides:

unconstitutional. Prior to trial, Floody filed a motion for appointment of an expert. Floody requested appointment of "someone with expertise ... that could look at the interview techniques" used in interviewing A.C. Floody objected to the State's presence at the proceeding, arguing that allowing the State to comment on his request for the appointment of an expert violated his right to equal protection of the law. Floody now argues his right to due process of law was also violated in that he was forced to reveal trial strategy in open court.

■ It is well established statutes are presumed constitutional. *In the Matter of the Certification of a Question of Law from the United States District Court, District of South Dakota, Southern Division*, 372 N.W.2d 113, 116 (S.D.1985). "There is a strong presumption in favor of the constitutionality of a statute, and this presumption is only rebutted when it appears clearly, palpably and plainly that the statute violates some provision of the state constitution." *Simpson v. Tobin*, 367 N.W.2d 757, 765 (S.D.1985); *Accord People in Interest of P.B.*, 339 N.W.2d 121, 123 (S.D.1983). "Furthermore, the party challenging the constitutionality of a statute bears the burden of proving beyond a reasonable doubt that the statute violates a constitutional provision." *Simpson*, 367 N.W.2d at 765–66; *State v. Big Head*, 363 N.W.2d 556 (S.D.1985); *Independent Community Bankers Association v. State*, 346 N.W.2d 737 (S.D.1984).

To support his argument, Floody relies on *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). We have noted the *Ake* Court recognized a state's duty to make certain an indigent defendant has access to an expert necessary to an effective defense. *State v. Jaques*, 428 N.W.2d 260, 264 (S.D.1988); *McCafferty*, 449 N.W.2d at 594–95. In *Ake* the Supreme Court held:

> [W]hen a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial; the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense.

*Ake*, 470 U.S. at 83, 105 S.Ct. at 1096, 84 L.Ed.2d at 66. The Ake Court noted "when the defendant is able to make an *ex parte* threshold showing to the trial court that his sanity is likely to be a significant factor in his defense, the need for the assistance of a psychiatrist is readily apparent." *Ake*, 470 U.S. at 82–83, 105 S.Ct. at 1096, 84 L.Ed.2d at 66. The *Ake* Court's statement regarding an ex parte hearing is not controlling here. In its holding the Court stated: "Our concern is that the indigent defendant have access to a competent psychiatrist for the purpose we have discussed, and as in the case of the provision of counsel we leave to the States the decision on how to implement this right." *Id.*[17]

We held in *State v. Sahlie*, the defendant was not denied due process or an adequate preparation of his defense where the trial court ordered the defendant's court-appointed handwriting expert to file written reports with the court clerk thus making the findings of the expert available to the prosecution. *State v. Sahlie*, 277 N.W.2d 591, 593–94 (S.D.1979) (*Sahlie II*).[18] We

---

The appointment of expert witnesses by the court shall be made only after reasonable notice to the parties to the proceeding of the names and addresses of the experts proposed for appointment.

**17.** We point out Floody was allowed to hire an expert, other than the out-of-state expert he requested, at county expense. The *Ake* Court held a defendant has no constitutional right to a psychiatrist of his personal liking at the state's expense. *Ake*, 470 U.S. at 83, 105 S.Ct. at 1096, 84 L.Ed.2d at 66. *Accord State v. Sahlie*, 90 S.D. 682, 245 N.W.2d 476 (1976) (*Sahlie I*).

**18.** In *Sahlie II*, we quoted Justice Traynor who stated:

> The identity of the defense witnesses and the existence of any reports or x-rays the defense offers in evidence will necessarily be revealed at the trial. The witnesses will be subject to cross-examination, and the reports and x-rays subject to study and challenge. Learning the identity of the defense witnesses and of such reports and x-rays in advance merely enables

have also held where an indigent defendant requests an appointed expert, the request must be made in good faith, must be reasonable in all respects, and the trial court should scrutinize such requests. *State v. Stuck*, 434 N.W.2d 43, 50–51 (S.D.1988). A trial court must be vested with wide discretion where government expense is involved to "prevent abuses often attempted by defendants." *Feguer v. United States*, 302 F.2d 214, 241 (8th Cir.), *cert denied*, 371 U.S. 872, 83 S.Ct. 123, 9 L.Ed.2d 110 (1962).

The Eleventh Circuit addressed an argument very similar to Floody's in *Clark v. Dugger*, 834 F.2d 1561 (11th Cir.1987), *cert. denied*, 485 U.S. 982, 108 S.Ct. 1282, 99 L.Ed.2d 493 (1988). In *Clark*, defense counsel requested the trial court appoint a psychiatrist to assist with an insanity defense. The applicable rule of criminal procedure contemplated the expert's findings were to be made available to the court and prosecution. At a hearing on the motion, Clark's counsel presented no evidence or argument as to why Clark should be entitled to appointment of a private psychiatrist but merely stated that if Clark had sufficient funds, he would have hired his own expert. This strategy was followed to prevent the state from learning facts which would have been detrimental to Clark's case. *Id.* at 1564 n. 6. As a result, the trial court refused to appoint a defense psychiatrist. Clark contended his rights "under the sixth, eighth, and fourteenth amendments" were violated, relying on *Ake* to support his argument. The Eleventh Circuit rejected Clark's *Ake* claim noting Clark's counsel failed to make the threshold showing necessary to mandate the assistance of a psychiatrist, and therefore, there was no constitutional deprivation. *Id.* at 1564–65.

Given the *Clark* and the *Sahlie II* holdings, it is difficult to perceive how Floody's constitutional rights were violated. Revealing defense experts' reports and x-rays in advance of trial would reveal a defendant's trial strategy; yet, we have

the prosecution to perform its function at the trial more effectively.

held such measures do not violate a defendant's due process rights. *Sahlie II*, 277 N.W.2d at 594. Further, we have contemplated that defense requests for experts appointed at county expense are to be scrutinized. *Stuck*, 434 N.W.2d at 51. We do not believe South Dakota statutes which permit, but do not require, adversarial hearings prior to appointment of expert witnesses violated Floody's due process rights or his right to equal protection of the law.

The judgment of conviction is affirmed.

MILLER, C.J., concurs.

SABERS, J., concurs specially.

HENDERSON and AMUNDSON, JJ., concur in part and concur in result.

SABERS, Justice (concurring specially).

I agree with the majority in issue IV(a) that it was error to admit the hearsay statement under the "excited utterance exception" for the reasons stated by the majority and for the reason that to fit within the exception, the hearsay statement must relate to a startling event or condition involving the defendant as opposed to a startling event or condition involving sex between the two children.

"[T]he statement involved must relate or pertain to the event or condition that caused the immediate or excited response." J. Larson, South Dakota Evidence, § 803.2, at 576 (1991); *see also* M. Graham, Handbook of Federal Evidence, § 803.2, at 837 (3rd Ed.1991); McCormick, Evidence, § 297, at 857–858 (3rd Ed.1984). Therefore, the "startling event or condition" existing between A.C. and Randy may support a hearsay statement about that event or condition but certainly will not support a hearsay statement about some prior and remote event or condition that occurred between A.C. and defendant.

I agree with the majority in issue V that A.C.'s testimony of Floody's other acts with her was properly admitted. These

*Id.* at 593–94 (quoting *Jones v. Superior Court of Nevada County*, 22 Cal.Rptr. 879, 372 P.2d 919 (1962)).

other acts were sufficiently contemporaneous with the acts charged and provide relevant evidence of the background and the relationship of the parties in the context of the charged acts.

Other courts have acknowledged that as to evidence of other occurrences a distinction exists between sexual molestation cases and other crimes. *See State v. Friedrich*, 135 Wis.2d 1, 398 N.W.2d 763 (1987). However, this distinction and the greater latitude given to admission of prior bad acts in sex crimes is and should be exercised only in the context of same defendant/same victim. The rationale for creating the distinction is that the victim's testimony as to prior similar acts by the defendant is necessary to "disclos[e] the relationship between the parties, [the] opportunity and inclination to commit the act complained of, and [to] corroborat[e] ... the specific charge." *State v. Haala*, 415 N.W.2d 69, 77 (Minn. App.1987). Testimony *by the victim*, but not by her step-sister, as to prior instances of sexual contact by the defendant may be relevant to the issue of intent in a charge for a violation of SDCL 22–22–7. (Emphasis in original).

*State v. Basker*, 468 N.W.2d 413, 418 (S.D. 1991) (Sabers, J., specially concurring) (quoting *State v. Champagne*, 422 N.W.2d 840, 845–46 (S.D.1986) (Sabers, J., dissenting)).

HENDERSON, Justice (concurring in part; concurring in result).

Sorely, am I troubled by this case.

This writing is penned by the author on Sunday, December 15, 1991, the 200th Anniversary of our country's Bill of Rights. For 17 years I have tried to protect our citizens' rights—to those Bill of Rights— first as a trial judge and later as a Supreme Court Justice. For 25 years prior thereto, as a lawyer in this state, absent my service as an infantryman in the 7th Cavalry Regiment in Korea in 1952 and 1953, I acted as a defense lawyer, principally in Western South Dakota. A man becomes ingrained, with 40 years of such thinking, into a mental mold which is difficult to set aside. Of course, impartiality on the Bench is mandated, encouraged, and a literal must. A good judge starts the ball game at 0 to 0. Objectivity is demanded, so that the defendant is afforded a fair trial and a little child is protected from sexual abuse. Victims of sexual crimes are entitled to protection of the law. Particularly, the law must be vigilant in providing its strength to the very young and the weak. Floody was sentenced to two concurrent terms of 70 years in the State Penitentiary.

Reviewing the evidence in this record, I am totally convinced that Floody got his "just desserts." Violating this defenseless, little girl's body over an extended period of time, was nothing less than dastardly. It is not difficult to understand the jury's verdict of guilty nor the severe sentence of the judge. No arrow of infliction is aimed at counsel for the defense, but as an appellate justice, it is understandable why neither the sentence nor the sufficiency of the evidence is attacked. Here, the evidence reflects that Floody committed, in a series of acts, sexual penetration upon this little girl. SDCL 19–12–5 [Fed.R.Evidence 404(b) ] was not violated with respect to other uncharged acts of sexual penetration and contemporaneous acts of sexual contact.

In the majority's treatment of all issues, I concur. But I simply cannot—will not— academically accede to the approval, by this Court, of the majority writer's treatment of Issue II. Initially, the question is not one of approving or disapproving of "the child sexual abuse syndrome." Correctly, the issue is framed as follows:

Did the trial court properly allow the state to present rebuttal testimony that either (a) directly or (b) indirectly implied that the victim was testifying in a truthful manner?

The answer is no. My position is as follows: Basically, a question of fact is for the jury. *Bogh v. Beadles*, 79 S.D. 23, 107 N.W.2d 342 (1961). It is not our function to resolve conflicts in the evidence, pass on the credibility of witnesses, or weigh the evidence. *Such functions are within the province of the jury. State v. Minkel*, 89

S.D. 144, 230 N.W.2d 233 (1975). Therefore, an expert "witness" should not invade the province of the jury. *State v. Logue,* 372 N.W.2d 151, 157 (S.D.1985).

"Syndrome" testimony is a sleeping giant. A prosecutor's mind quickens when such evidence is elicited. Soon, the giant is stirred and awakened. Then it is ready for rampage, quick to devour. It needs a victim—a victim to eat so that it leaps from general testimony to bolstering the credibility of a witness. Once that happens, the Bill of Rights' fair trial guarantee is jeopardized. Such evidentiary enlargement runs afoul of Article VI, § 7, Bill of Rights, South Dakota State Constitution. It eliminates the right to face an accuser. It prevents a jury from deciding an issue of fact.

In this factual scenario and in the majority opinion, it is noted: "Kathy Peil, a certified social worker, testified in rebuttal the interview techniques used in A.C.'s case were acceptable." Says who? Why should she be able to characterize "interview techniques" as being "acceptable?" Should not the jury, within its province to find the facts, decide if the interview techniques were "acceptable?" Such a conclusory statement absolutely strips away a jury's obligation to find the facts. Immense energies are required sometimes to learn or prevail. Minds quicken when energy is expended.* Expending energy, it is worth noting that the so-called "syndrome" testimony is fraught with the risk of proceeding from general testimony to bolstering the credibility of a witness, as I have alluded to above. Members of our Court have been troubled by this on several occasions. Read *State v. Bachman,* 446 N.W.2d 271, 277–80 (S.D.1989), separate dissents of Henderson, J. and Sabers, J.; *McCafferty v. Solem,* 449 N.W.2d 590, 596, dissent of Henderson, J.; *State v. Spaans,* 455 N.W.2d 596, 599–600 (S.D.1990), dissent of Henderson, J.; *United States v. Azure,* 801 F.2d 336 (8th Cir.1986); *State v. Lindsey,* 149 Ariz. 472, 720 P.2d 73 (1986). Ms. Peil should not have been permitted to testify

to the *quality* of the interviewing techniques. If you will read again the statement of Ms. Peil, quoted in the majority opinion, her comments went further than an opinion on interview techniques. My reading of the quote causes me to opine that such testimony is a comment on the veracity of the little girl. This witness went too far, she became the fact finder. She said the statement of A.C. was "spontaneous." Not once, but twice. She was characterizing, by adjective, the expression of the little girl to thus add a stamp of credibility to the little girl's remarks. It seems to me this was forbidden by previous case law in this Court. *Logue,* 372 N.W.2d at 151, 157; *McCafferty v. Solem,* 449 N.W.2d at 593–594. Another troubling feature of this testimony is the procedural background through which this testimony went before the jury.

Background thereof now follows: Prior to trial, the defendant filed a Motion in Limine seeking to preclude the State from offering testimony at trial concerning the so-called child sexual abuse syndrome. The state filed a resistance to the motion, and the matter was taken up at a pre-trial hearing. Defense counsel expressed concern that if the court were to overrule this motion and allow such testimony, that there was a danger that the testimony would go too far and imply that the alleged acts of sexual abuse did occur. The trial court, after hearing further argument of counsel, denied the motion but cautioned that no witness either for the state or the defendant, "opine that another witness is tell (sic) the truth or lying."

At trial, as part of the state's case in chief, as I have related, Peil, a certified social worker, did testify as to the child sexual abuse syndrome. However, during the rebuttal portion of the case, the state recalled her to ostensibly comment on the interview techniques of Deputy Humphrey, which she had heard as she was present in the courtroom when Humphrey testified. Outside the presence of the jury, defendant

---

* A desire to know the *why* and *how* of it, springing from the lust of an inquisitive mind, is the chief contributor to knowledge.

objected to any further testimony by Ms. Peil, as there was danger that she was going to directly or indirectly comment on the veracity of the victim or some other witness for the state. The state argued that Ms. Peil's testimony was in rebuttal to that of Bryce Flint, a deputy State's Attorney, who had testified as to the procedures followed in Meade County in interviewing young subjects of possible sexual abuse.

The difficulty, however, with the state's position was that Flint did not specifically comment on the interview techniques in this case. In fact, he did not have any knowledge of the actual interview techniques actually employed, or, for that matter, any other facts surrounding this proceeding. Nonetheless, trial court overruled defense counsel's objection, then allowed a standing objection to Peil's testimony, and further allowed the state to elicit an opinion from said witness as to the quality of the interviewing techniques. I fear trial by experts. Trials are supposed to be by a jury. Jury trials are the soul of the American system of justice.

Was Floody's right to a fair trial *hopelessly* compromised? I doubt it. Surely this evidence damaged his defense. I will concede that this witness did not go so far as in *Logue*. But the trial court permitted Peil to go too far. It was an evidentiary error. Should the case be reversed on such error? Well, the burden is on appellant to show not only error but also *prejudicial error*; and it must be to the effect that under the evidence, the jury might and probably would have returned a different verdict. *State v. Wimberly*, 467 N.W.2d 499, 504 (S.D.1991); *State v. Davis*, 401 N.W.2d 721, 725 (S.D.1987).

A defendant is entitled to a fair trial, not a perfect one. *Brown v. United States*, 411 U.S. 223, 231, 93 S.Ct. 1565, 1570, 36 L.Ed.2d 208, 215 (1973); *see State v. Bennis*, 457 N.W.2d 843, 847 (S.D.1990) (quoting *Brown v. United States*, 411 U.S. 223, 231, 93 S.Ct. 1565, 1570, 36 L.Ed.2d 208, 215 (1973)). A jury saw and heard this little girl testify. Her testimony was vivid in detail. This testimony was before the jury reflecting horrid conduct upon A.C.'s body. A physician testified that he examined A.C. on March 21, 1990 and noted a bruise a square centimeter in an area on the right side of her genital lips. Sexual penetration certainly occurred. Direct and circumstantial evidence all pointed to one person as the perpetrator—Floody. State, under this record, met its proof of "beyond a reasonable doubt." Reviewing this entire case, I am struck with the view that Floody would have been convicted of these two crimes of rape regardless of the evidentiary error. I join the majority opinion in its affirmance but concur in result due to the expansion, nay liberality, of the viewpoint that the social workers, certified or not, can come into a courtroom and usurp the function of the jury. I despise it. It is a far cry from the constitutional safeguard of "facing your accuser." We have another example of prosecutorial overkill by prosecutors of this state. Knowing that the little girl was going to testify, why was Kathy Peil called as a witness to characterize her testimony? Now you've heard "the rest of the story." Let us be vigilant, on the 200th birthday of the Bill of Rights, to instill a deep respect for the Bill of Rights lest our liberty dribble into legal infinity. Your servant, F. Henderson.

I am hereby authorized to state that Justice AMUNDSON joins this concurrence.