**STATE of South Dakota, Plaintiff
and Appellee,**

v.

**Ronald Ray CORDER, Defendant
and Appellant.**

**No. 16704.**

Supreme Court of South Dakota.

Argued May 21, 1990.

Decided Sept. 5, 1990.

Frank E. Geaghan, Asst. Atty. Gen., Pierre, for plaintiff and appellee; Roger A. Tellinghuisen, Atty. Gen., Pierre, on brief.

James E. McCulloch, Minick, Nelson & McCulloch, Vermillion, for defendant and appellant.

HENDERSON, Justice.

## PROCEDURAL HISTORY

Ronald Ray Corder (Corder) and Harvey Ernst (Ernst) were initially charged by complaint on December 5, 1988, with First Degree Murder. On December 13, 1988,

before a preliminary hearing could be held, Corder and Ernst were indicted by a Clay County grand jury with one count each of Premeditated First Degree Murder, one count each of First Degree Felony Murder and one count each of Second Degree Murder.

On January 30, 1989, Corder filed a motion with the court asking that his trial be severed from that of Ernst. That motion, together with a motion to suppress, were heard by the court on February 9, 1989. On March 14, 1989, the trial court granted Corder's motion for severance but denied the motion to suppress.

A jury trial began April 24, 1989. At the conclusion of the trial on May 2, 1989, the jury returned a verdict of guilty against Corder for Premeditated First Degree Murder. On May 9, 1989, Corder was sentenced to life in prison. On appeal, Corder argues that:

(1) His motions to suppress evidence should have been granted;

(2) His proposed jury instruction number 10 should have been given to clarify aiding and abetting; and,

(3) His motion for judgment of acquittal should have been granted.

–Holding–

Deeming these contentions to be nonmeritorious, we affirm on all issues.

FACTS

On the morning of December 4, 1988, the bludgeoned and lifeless body of Clifford Hirocke (Hirocke) was found by two hunters, 3 miles south of Vermillion. Due to the injuries inflicted on the body, authorities began investigating the case as a homicide.

Law enforcement authorities received information that Corder and Ernst had been with the victim at approximately 2:15 a.m. on December 4, 1988, at a local bar and subsequently a pizza establishment in Ver-

million.[1] Since Corder and Ernst were apparently the last persons to have seen Hirocke alive, a determination was made by law enforcement officials to interview Corder and Ernst concerning their whereabouts on the evening of December 3rd and the early morning hours of December 4, 1988.

During the evening hours of December 4, 1988, an unmarked patrol car was dispatched to the home of Corder. Corder was spotted pulling his vehicle into his driveway at approximately 7:50 p.m. As Corder left his vehicle, he was confronted by DCI agent Neidringhaus, who identified himself and asked for Corder's driver's license, which was produced. Corder was advised that they were trying to ascertain what knowledge he might have concerning Hirocke's whereabouts after 2:30 a.m. the night before.

Corder was informed by Neidringhaus that "we need to ask you some questions." Corder was asked if he would be willing to drive his vehicle to the police station, which he did. His girlfriend and young son accompanied him.

At the police station, Corder was taken to an interview room where he was alone with agents Neidringhaus and DeVaney. These agents advised Corder that they were investigating the death of Hirocke. The initial interview started at 8:00 p.m. and lasted approximately 10–20 minutes. The conversation centered on his whereabouts during the early morning hours of December 4th. Corder made no incriminating statements during this interview.

While he was being interviewed, blood and hair were observed on the hood of Corder's vehicle. Immediately after the interviewers were informed of this fact, Corder was read Miranda warnings. Corder was then informed that blood was observed on his vehicle's hood. He waived his Miranda rights and gave an incriminating oral confession to the authorities.[2]

1. Corder was stopped for erratic driving at 4:30 a.m. on that morning. Ernst was a passenger in Corder's vehicle.

2. Corder testified on cross-examination at the suppression hearing that, "I volunteered to answer their questions." Further, Corder stated that there were never any guns drawn or threatening gestures made against him; that he never

After giving this oral confession, Corder was once again given his Miranda warnings. Asked if he understood those rights, Corder then signed the Miranda card. He thereafter furnished the police with a written statement consistent with his oral confession.

Corder's girlfriend, Misty Stice Porter (Porter) gave a statement to authorities implicating both Corder and Ernst in Hirocke's death. They were married five weeks after Porter gave the statements.

A search warrant was subsequently obtained to search Corder's vehicle and house. Four days later, a search warrant was obtained for blood and hair samples from Corder.

## DECISION

I. *The trial court did not err in denying Corder's motion to suppress evidence.*

Corder moved the trial court for an order to suppress all oral, verbal, written and physical evidence obtained during the course of the interview conducted by law enforcement on December 4, 1988, claiming his Fourth Amendment rights were contravened. The trial court denied Corder's motion.

■ We review the trial court's findings in connection with the motion to suppress under the clearly erroneous standard. *United States v. Lewis*, 738 F.2d 916, 920 (8th Cir.1984). Under this standard, the decision of the lower court must be affirmed unless it lacks the support of substantial evidence, it evolves from an erroneous view of the applicable law, or upon considering the entire record, we are left with the definite and firm conviction that a mistake has been made. *United States v. Lewis*, 738 F.2d at 920. We must consider the evidence in a light most favorable to support the trial court's denial of Corder's suppression motion. *State v. Hall*, 353 N.W.2d 37, 40 (S.D.1984).

■ Initially, Corder argues that he was "in custody" for purposes of receiving Miranda protection during his initial encounter with the DCI agents. The test of custody or non-custody is whether, under the totality of the circumstances, a reasonable person would not believe himself free to go. *Terry v. State of Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The United States Supreme Court has further stated that the ultimate inquiry, based on the circumstances of each case, is whether there is a restraint on the suspect's freedom of movement "of the degree associated with a formal arrest". *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983).

In *State v. McQuillen*, 345 N.W.2d 867, 870 (S.D.1984), we stated:

It is fundamental that before the Miranda warning needs to be given, there must be a 'custodial interrogation' of the individual. The court in Miranda defined 'custodial interrogation' as questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of freedom in any significant way. The Supreme Court has also stated that police officers are not required to give the Miranda warning simply because the questioning takes place in the station house or because the questioned person is a suspect; the warning is only required when there has been such a restriction on the person's freedom as to render him in custody. Oregon v. Mathiason, 429 U.S. 492, [97 S.Ct. 711] 50 L.Ed.2d 714 (1977). The court found no 'custodial interrogation' where the defendant went to the station house voluntarily, the questioning took place for one half hour behind closed doors, and defendant was told that he was a suspect.

This Court, in *McQuillen*, set out a number of factors to be examined in determining whether an interrogation is custodial or non-custodial, which includes: probable cause of arrest, subjective intent of the defendant, focus of the investigation, na-

asked to leave the police station; that he never asked to call a lawyer; and that he was treated

alright.

ture of the interrogator, nature of the suspect, time and place of the interrogation, nature of the interrogation, and purpose of the investigation.

Here, we conclude that Corder was not in custody at the time of the initial interview. He voluntarily drove his own vehicle to the police station. He was advised by the DCI agents that he was not under arrest at the time of the interview at the police station. There was no restraints of any kind placed upon Corder. The initial interview at the station concerned only the whereabouts of Corder during the early morning hours of December 4, 1988. The interviews were short, lasting from 10 to 20 minutes. It is further noted that at the time of the initial interview, the police did not have any probable cause to arrest Corder for the death of Hirocke. The police were simply using the only information they had, which was that Corder and Ernst were with the victim in the early morning hours of December 4th and apparently were the last persons that saw Hirocke alive. We are satisfied from the totality of the circumstances that Corder was not in custody, either at his residence or at the initial interview at the police station. *Terry, supra.* Furthermore, it must be noted that during the initial interview, none of Corder's statements contained inculpatory remarks. It is well established that before any claimed admission can be ruled involuntary, the accused must have said something inculpatory. *State v. Gregg,* 405 N.W.2d 49, 53 (S.D.1987). Having decided the custody issue against Corder, it follows that the blood on the hood of his car was properly allowed in as evidence by the trial court.

Corder also argues that the police officers did not discover the blood and hair on his car inadvertently. However, the inspection of Corder's vehicle was authorized under the plain view doctrine. Plain view requires that the evidence be discovered inadvertently, in other words, that the officers did not know in advance the location of the evidence. *Texas v. Brown,* 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983). Here, no evidence whatsoever has been offered by Corder that the officers were expecting to find the incriminating (hair and blood) evidence on the vehicle. Agent Woehl testified that he had gone out to Corder's car for purposes of taking preliminary measurements of the tire width. It was while he was taking photographs of the tires that Agent Woehl noticed what appeared to be blood on the hood of the vehicle. Though the officer's viewing of the tire was not inadvertent, his discovery of blood on the hood of the car was. It was only after the discovery of the blood on the hood that the investigation centered directly on Corder. At that point, he was placed under arrest and given his Miranda rights, which the trial court determined he waived voluntarily, thereafter, giving his statement to the police officers. However, Corder now asserts that his statements were coerced and not voluntary.

Our standard of review of the trial court's findings regarding the voluntariness of confessions or incriminating statements is well established. The State must prove beyond a reasonable doubt that incriminating statements or confessions are freely and voluntarily made. *State v. Janis,* 356 N.W.2d 916, 918 (S.D.1984). The trial court found that Corder's confession was voluntarily made. Such finding is binding upon this Court unless it can conclude from a review of the record that the finding is clearly erroneous. *State v. Faehnrich,* 359 N.W.2d 895 (S.D.1984). In reviewing the trial court's findings on voluntariness, we must consider the evidence in the light most favorable to the finding. *State v. Volk,* 331 N.W.2d 67 (S.D.1983).

Here, there is simply nothing in the record to indicate that the will of Corder was overborne by any coercive and threatening actions by the investigating officers. Corder was a mature twenty-five year old adult of normal intelligence. The interrogation was for a short period of time. Further, the tactics employed by the DCI agents were not manipulative. The evidence clearly shows that his confession was voluntarily, knowingly and intelligently made, with a full understanding of all his Miranda rights. Therefore, the search

warrant issued for Corder's house and car is deemed to be valid and not the fruits of an illegal detention or a coerced statement. This, likewise, includes the search warrant which was issued some four days after the property warrant as it relates to the hair and blood samples. The trial court did not err in its determination that Corder's confession was voluntary and admissible.

II. *The trial court did not err in refusing to give Corder's proposed "clarifying" jury instruction on aiding and abetting.*

■ In response to Corder's request for a clarifying instruction, we submit that if the instruction was given, the court would be introducing instructions concerning an accessory after the fact.[3] Such a homicide theory had not been a part of the case from the beginning. We submit that the proposed instruction would only confuse the jury, not make things more clear.

The instructions given by the trial court were clear that Corder's involvement in the crime must have been before or at the time of its commission. The jury was properly instructed and adequately informed of its responsibilities.

■ In addition, Corder has failed to show that prejudicial error resulted from the trial court's action. In *State v. Grey Owl*, 295 N.W.2d 748 (S.D.1980), a two-prong test was set out for determining when a conviction must be reversed as a result of the trial court's failure to give a requested instruction. First, the evidence presented at trial must warrant the instruction. *State v. Wilson*, 297 N.W.2d 477 (S.D.1980). Second, the defendant has the

burden to show not only error but prejudicial error resulted from the failure of the trial court to give the proposed instruction. In order to establish a claim of prejudicial error, Corder must show "that under the evidence, the jury might and probably would have returned a different verdict if the requested instruction had been given." *State v. Grey Owl, supra.*

■ We find no prejudice to Corder in this case. Moreover, there was no evidence to support the theory behind Corder's proposed jury instruction. Thus, it would have been improper to submit it to the jury. *Jahnig v. Coisman*, 283 N.W.2d 557 (S.D.1979).

III. *The trial court properly denied Corder's motion for judgment of acquittal.*

■ At the end of the State's case-in-chief and at the end of all the evidence, Corder moved for a judgment of acquittal. Those motions, however, were denied by the trial court and the case was thereafter submitted to the jury. Corder now argues on appeal that the trial court erred in denying said motions.

■ In reviewing a motion for judgment of acquittal, the trial court must view the evidence in a light most favorable to the nonmovant. *State v. Caylor*, 434 N.W.2d 582 (S.D.1989); *State v. Ashker*, 412 N.W.2d 97 (S.D.1987). A motion for judgment of acquittal is properly denied if the State has introduced evidence upon which, if believed by the jury, they may reasonably find the defendant guilty of the crime charged. *State v. Olson*, 408 N.W.2d 748 (S.D.1987). The State, in prov-

---

**3.** Corder's proposed instruction reads: If a person, with intent to hinder, delay or prevent discovery, detection, apprehension, prosecution, conviction or punishment of another for the commission of a felony, renders assistance to the other person by:
  1. Harboring or concealing the other person; or
  2. Warning the other person of impending discovery or apprehension; or
  3. Providing the other person with money, transportation, a weapon, a disguise or any other thing to be used in avoiding discovery or apprehension; or

**4.** Obstructing anyone by force, intimidation or deception in the performance of any act which might aid in the discovery, detection, apprehension, prosecution, conviction or punishment of the other person; or
  5. Concealing, destroying or altering any physical evidence which might aid in the discovery, detection, apprehension, prosecution, conviction or punishment of the other person, he is not an aider or abetter, but chargeable and punishable under other laws of the State of South Dakota.

ing all the elements of the crime, may rely on circumstantial evidence. *State v. Bult,* 351 N.W.2d 731 (S.D.1984).

Corder argues that the trial court erred in denying his motion for a directed verdict of acquittal on the grounds that the State failed to establish the prima facie showing of premeditation. There is abundant case law to the effect that the fact of premeditation may be inferred from the facts and circumstances surrounding the killing. *State v. Kost,* 290 N.W.2d 482, 486 (S.D. 1980). The question of Corder's premeditation in the killing of Hirocke was a question of fact for the jury. On appeal, the jury's finding of premeditation will not be disturbed unless there is an absence of evidence which would support a reasonable inference thereof.

 In determining the sufficiency of evidence to establish a premeditated design to effect death in murder cases, the courts generally consider the following factors of importance: the use of a lethal or deadly weapon; the manner of the killing; the accused's conduct before and after the killing; and a determination of the presence or absence of provocation. *State v. Marshall,* 264 N.W.2d 911, 916 (S.D.1978); *State v. Feuillerat,* 292 N.W.2d 326, 331 (S.D.1980).

The testimony adduced at trial pertaining to Corder's deliberation and premeditation may be capsulized as follows:

Hirocke was beaten repeatedly about the head and chest areas. According to the pathologist who performed the autopsy, the cause of death was listed as multiple head and abdominal trauma. Hirocke suffered a laceration to his liver and had multiple rib fractures. The pathologist testified that any one of these injuries could have easily resulted in the victim's death.

The record also shows that Ernst stated that they "had to make sure he was dead, they had to kill him." With that in mind, Corder went to where Hirocke was lying and picked up a log. After striking Hirocke in the head with the log, Corder threw it into the river. Surely there was sufficient time for Corder to form the intent to kill and an opportunity for him to reconsider the matter and not strike Hirocke with the log. Further, in an apparent attempt to conceal evidence, Corder removed Hirocke's shirt and jacket and tried to burn them in order to destroy any fingerprints. Attempting to remove any remaining fingerprints, Corder dragged Hirocke's body along the ground.

While there was no evidence of a highly structured plan to kill Hirocke, we are persuaded that sufficient evidence was produced to support a reasonable inference of premeditation and that, therefore, the jury's finding of this fact should not be disturbed. Murder has no tongue, yet it speaks by direct and circumstantial evidence, through the organ of law, demanding justice.

Conviction of premeditated first degree murder and sentence of life in prison, in all things, affirmed.

All the Justices concur.