1997 SD 118

**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Lorenzo BENALLIE, Defendant and Appellant.**

No. 19885.

Supreme Court of South Dakota.

Considered on Briefs Sept. 10, 1997.

Decided Oct. 15, 1997.

Mark Barnett, Attorney General, Jeffrey P. Hallem, Assistant Attorney General, Pierre, for Plaintiff and Appellee.

Paul E. Jensen of Jensen and Massa, Winner, and Anne Crowson Plooster, White River, for Defendant and Appellant.

MILLER, Chief Justice.

[¶ 1.] Defendant Lorenzo Benallie appeals his conviction of second-degree murder arising out of a stabbing incident on April 1, 1996 in White River, South Dakota. He asserts that the warrantless search of the trailer house in which he resided was unlawful because law enforcement did not rely on proper consent to search. He also argues that evidence taken from his person was obtained from an unlawful search and, further, that since two of the State's witnesses violated a sequestration order, the trial court should have granted his motion for a mistrial. We affirm.

## FACTS

[¶ 2.] Benallie lived in Blossom Clairmont's trailer house in White River, with Clairmont and her two daughters from the fall of 1995 until the night of April 1, 1996, when he was arrested for the murder of Joe Moran. On that night, after a great deal of drinking and use of marijuana in Clairmont's trailer, Benallie and Moran got into a scuffle. It culminated when Benallie got off the bed upon which he was sitting and lunged at Moran, striking him in the face. Benallie fell on top of Moran and wrestled with him, while Clairmont and another party tried to break them apart. Moran eventually opened the back door and fled in a southerly direction. Benallie then handed the knife with the blade open to Clairmont. Although no one actually saw Benallie stab Moran, one witness testified that he saw the handle of Benallie's knife in Benallie's hand when he struck Moran. Blood was observed on Benallie's right hand and forearm as he came back into the trailer.

Clairmont told Benallie to remain in the trailer house and she left for her sister's house.

[¶ 3.] Moran had fled to a nearby home and knocked on the door. Two men inside the house saw him lying on the steps, bleeding profusely from his neck. His last words were for one of the men to call an ambulance.

[¶ 4.] Two law enforcement officers, Police Chief Joe Krogman and Deputy Sheriff Mike Blom, responded to the 911 call. Deputy Blom worked unsuccessfully with the ambulance crew to revive Moran. Chief Krogman, in the meantime, followed a trail of blood that led him across the street. He observed a pool of blood around a telephone pedestal and then saw a light on in Clairmont's nearby trailer house. Although the trail of blood did not lead him directly to the trailer house, Krogman approached the house and knocked on the door. He knew that Clairmont lived there, but he did not recognize Benallie when he answered the door. Krogman observed fresh blood on Benallie's hand, between his fingers, around his wrist, and on his clothes. Krogman asked Benallie several questions, including why he had blood on him, to which Benallie responded that a dog had bitten him.

[¶ 5.] Krogman placed Benallie under arrest. Before transporting him to the jail, Krogman and Blom took samples of the blood observed on Benallie's wrist. While Benallie was being transported to jail in the back seat of Krogman's patrol car, he began saying such things as: "Joe, I didn't mean to hurt you. Joe I love you. I am sorry I hurt you." Krogman heard this and turned on a tape recorder to record the rest of Benallie's statements. Upon arrival at the police station, a sample of Benallie's blood was taken.[1]

[¶ 6.] The police investigated the crime scene from shortly after 10:00 p.m. on April 1, through the morning of April 2, and then again on the following Friday.[2] The police

---

1. A chemist at the State Health Laboratory tested this sample and determined it had a blood-alcohol content of .223% alcohol by weight. Based upon his extrapolations, the chemist testified that at the time the crime was committed, Benallie had a blood-alcohol content of .26%.

2. Upon the advice of her counsel, Clairmont agreed to cooperate with the state's attorney. She let the state's attorney and the officers into her house on the Friday after Moran was killed to investigate the crime scene. She also gave a key to her trailer house to Deputy Blom at this time.

obtained evidence from these investigations including photographs of the crime scene and blood samples. Clothes from Moran, Clairmont, and Benallie were also taken and tested. Clairmont and her relatives even helped the police find Benallie's knife that was hidden in the back bedroom.

[¶ 7.] Prior to trial, Benallie filed a motion to suppress evidence on two grounds: (1) that there was not a valid consent to allow the police to conduct a warrantless search of the trailer house, and (2) that any evidence taken from his person was the result of an unlawful, warrantless arrest. The trial court denied this motion.

[¶ 8.] Benallie was charged with murder. At trial, the jury returned a verdict of not guilty of murder in the first degree, but guilty of murder in the second degree. Benallie appeals.

## DECISION

**Whether the trial court erred in determining that the search of the trailer house was pursuant to a valid consent search.**

[¶ 9.] Benallie claims the evidence the police obtained from the search of the trailer house should have been suppressed because the police were not relying on proper consent. We disagree.

■ [¶ 10.] Our standard of review is well settled:

"A trial court's findings of fact from a suppression hearing must be upheld unless they are clearly erroneous. . . . This court's function under the clearly erroneous standard is to determine whether the decision of the lower court lacks the support of substantial evidence, evolves from an erroneous view of the applicable law or whether, considering the entire record, we are left with a definite and firm conviction that a mistake has been made. In making this determination, we review the evidence in a light most favorable to the trial court's decision."

State v. Dreps, 1996 SD 142, ¶ 8, 558 N.W.2d 339, 341 (citing State v. Baysinger, 470 N.W.2d 840, 843 (S.D.1991)). For a consent to search to be valid, it must be shown that under the totality of the circumstances the consent was given voluntarily. State v. Krebs, 504 N.W.2d 580, 587 (S.D.1993). The burden is on the State to prove by clear and convincing evidence that the consent was voluntary. State v. McGarrett, 535 N.W.2d 765, 767 (S.D.1995). Whether consent to search was given is a question of fact, so we apply the clearly erroneous standard to the trial court's findings and view the evidence in the light most favorable to that finding. Dreps, 1996 SD 142 at ¶ 8, 558 N.W.2d at 341.

■ [¶ 11.] The trial court determined that Clairmont gave consent to search the trailer house and that the consent was voluntary. We agree. For consent to be valid, it must be given by someone with the authority to consent and it must be voluntary. Consent can be given by a third person who has " 'common authority over or other sufficient relationship to the premises or effects sought to be inspected.' " State v. Tapio, 459 N.W.2d 406, 414 (S.D.1990) (citation omitted); see also State v. Fountain, 534 N.W.2d 859, 865 (S.D.1995). There is no question that Clairmont had the authority to consent to a search of her own trailer house. The evidence is also clear that Clairmont gave her consent voluntarily. She testified at the motion hearing that Chief Krogman merely asked her if he could search the house and she let him.[3]

[¶ 12.] The trial court also found that Clairmont never withdrew her consent to search, even when the search was continued later that night and again on the following Friday. That finding is clearly supported by the evidence. See Krebs, 504 N.W.2d at 588 (holding that the scope of a consent search is based on an "objective reasonableness" test) (citing Florida v. Jimeno, 500 U.S. 248, 251, 111 S.Ct. 1801, 1803, 114 L.Ed.2d 297, 302 (1991)). See also United States v. Blake, 888 F.2d 795, 798 (11thCir.1989) (stating that the extent of a consent search is determined by

---

**3.** At trial, Clairmont testified that Krogman told her that if she did not let them search the house he would have to get a search warrant. Such a statement does not amount to duress or coercion so as to change the voluntariness of Clairmont's consent.

looking at the totality of the circumstances). In looking at the totality of the circumstances, it is clear that Clairmont consented to a search of her trailer, and at no time did she attempt to limit that search. She also never withdrew her consent. She always cooperated with the police and never objected to their presence in her house. She even found Benallie's knife and immediately handed it over to Deputy Blom. On the Friday following Moran's death, Clairmont allowed the state's attorney and the officers to search her house, and gave them a key to her house at that time.[4] There was never any indication that the consent to search was ever limited or withdrawn by Clairmont, and we affirm the trial court's findings on this issue.

[¶ 13.] Benallie apparently does not deny that Clairmont testified that she gave consent to Chief Krogman. Rather, he argues that neither Chief Krogman nor Deputy Blom testified that they relied on consent from Clairmont when searching the trailer house. Benallie states that in order for the officers to have conducted their search within the "objective reasonableness" scope set forth by *Jimeno* and *Krebs,* they needed to testify that they relied on the consent when searching. This is an interesting argument, but is simply not true. This case is similar to the issue we faced in *Fountain,* 534 N.W.2d at 863–64, wherein consent to search a home was given to a detective by the owner of the home. A different police officer testified that consent was given, and neither the person giving consent nor the detective who actually received the consent testified. Nevertheless, this Court held that such was sufficient to constitute clear and convincing evidence that consent was given.

[¶ 14.] It is true that the only testimony that consent was given came from Clairmont. Chief Krogman neither testified that he relied on Clairmont's consent when searching nor that he did not rely on her consent. More importantly, however, Clairmont testified that she gave consent to Chief Krogman and there is nothing in the record to refute that. Mere failure of Krogman to

testify that he relied on Clairmont's consent was not fatal. Likewise, the fact that Deputy Blom did not testify that Clairmont gave him consent to search does not destroy the fact that Clairmont did testify that she consented to the search. There is no requirement that consent be given to every investigating officer before they are allowed to search. *See People v. Brown,* 162 Ill.App.3d 528, 114 Ill.Dec. 14, 20, 515 N.E.2d 1285, 1291 (1987), *appeal denied,* 119 Ill.2d 561, 119 Ill.Dec. 389, 522 N.E.2d 1248, *cert. denied sub nom., Brown v. Illinois,* 488 U.S. 841, 109 S.Ct. 112, 102 L.Ed.2d 86 (1988). Also, a consent search cannot be qualified by the number of officers allowed to search. *United States v. Rubio,* 727 F.2d 786, 797 (9thCir.1983) (holding that once proper consent has been obtained, the admission of more officers to search would not further diminish any expectation of privacy). Consent may not have been given to Blom directly, but the consent given to Chief Krogman was not limited in any way and that is enough. Viewing the totality of the circumstances, we are of the opinion that the trial court's findings were not clearly erroneous and we affirm on this issue.

[¶ 15.] We have considered all of the other issues raised by Benallie and find them to be totally lacking in merit.

[¶ 16.] Affirmed.

[¶ 17.] SABERS, AMUNDSON, KONENKAMP and GILBERTSON, JJ., concur.

---

4. Clairmont testified at trial that she cooperated with the state's attorney upon the advice of her own attorney.