1999 SD 83

**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Bruce Edgar SMITH, Sr., Defendant and Appellant.**

No. 20384.

Supreme Court of South Dakota.

Considered on Briefs March 23, 1999.

Decided June 30, 1999.

Mark Barnett, Attorney General, Frank Geaghan, Assistant Attorney General, Pierre, for plaintiff and appellee.

Thomas E. Adams, Deadwood, for defendant and appellant.

GILBERTSON, Justice

[¶ 1.] Bruce Edgar Smith, Sr., (Smith) was indicted on twenty-five counts of rape in violation of SDCL 22–22–1(2) (forcible rape) or in the alternative rape in violation of SDCL 22–22–1(5) (statutory rape) and sexual contact with a minor in violation of SDCL 22–22–7 and SDCL 22–4–1. Following a jury trial, he was found guilty of eighteen counts of forcible rape. Smith appeals. We affirm.

**FACTS AND PROCEDURE**

[¶ 2.] Smith was married to Doris Smith (Doris) in 1989. Doris had one child, N.F. who was born in 1980. Smith had two sons, B.S. born in 1974, and S.S. born in 1977.

[¶ 3.] In the summer of 1994 the family moved to Custer, South Dakota from Colorado. In September 1994, they moved to Lead, South Dakota, with the exception of S.S. He had been sent to live with his mother as Doris found out N.F. was pregnant and believed S.S. to be the father. N.F. became pregnant prior to the family's departure from Colorado. N.F.'s child, C.S., was born February 13, 1995.

[¶ 4.] In 1996, Doris filed a CHINS[1] petition to have N.F. admitted to Our Home, a group facility in Parkston, South Dakota. N.F. was continuing to have a sexual relationship with S.S., against the wishes of Smith and Doris. While she was at Our Home, she confided in a counselor that Smith had repeatedly molested her. The counselor turned this information over to law enforcement.

[¶ 5.] When the officers interviewed N.F. she told them the sexual abuse by Smith began when she was 12. At first, Smith began to touch her "private parts." He next took her in his van to places outside of town and made her remove her clothes. She was uncooperative. He then threatened her stating she would never see her mother or little sisters[2] again if she did not cooperate. He attempted to have sexual intercourse with her but was unsuccessful due to her small size. When she was 13 and the family was living in Ashland, Wisconsin, Smith successfully had intercourse with N.F. for the first time. For the next few years, N.F. reported, Smith had sexual intercourse or oral sex with her on almost a daily basis. N.F. claims Smith told her not to tell anyone, threatening her and later threatening her unborn child. N.F. told officers that she had told her mother she was worried about becoming pregnant. At that time her mother replied: "you don't have much to worry

---

1. Child in Need of Supervision, SDCL 26–8B–1—SDCL 26–8B–9.

2. Doris actually had three daughters, but the other two lived with their father.

about because Bruce is almost completely sterile."

[¶ 6.] On November 18, 1996 Deputy Sheriff Duane Russell (Russell) and DCI Agent Dave Mueller (Mueller) contacted Smith in his hotel room in Deadwood, South Dakota. They asked that he come to the Sheriff's Office to answer questions about his stepdaughter. Doris drove Smith to the Sheriff's Office where he was interviewed.

[¶ 7.] Smith was given his *Miranda* warning before the interview began. He indicated he understood his rights and was willing to waive his rights and allowed the interview to proceed. Smith denied having any type of sexual relationship with N.F. He stated N.F. was "full of shit" and if he did have a sexual relationship with N.F. he would "blow [his] head off." He did, however, relate to the police a dream he had involving N.F. He had dreamed he was drunk and "her and I had gone to bed." He told officers he later asked Doris if he and N.F. had ever had sex, to which she replied, "you never had sex with her, did you?" During the interview he did agree to take a DNA test to prove the paternity of C.S.

[¶ 8.] On February 26, 1997, Deputy Russell obtained a search warrant to obtain a blood sample from Smith. The purpose of the sample was to compare the DNA of N.F.'s son C.S. to Smith's DNA. He was again given his *Miranda* warning. He invoked his rights and declined to answer any questions. Russell asked no further questions. When he was walking down the hall at the Sheriff's department, Smith spontaneously stated to Russell, "What am I going to do if I am the father of that child?"

[¶ 9.] The results of the DNA test showed S.S. could not be the father of the child. However, there was a 99.9% chance Smith was the father of C.S. A second test was conducted. It produced the same results.

[¶ 10.] The jury found Smith guilty on eighteen counts of forcible rape in violation of SDCL 22–22–1(2). A trial to the court was subsequently held on the habitual offender charge and Smith was adjudicated a habitual offender. He was sentenced to 18 terms of twenty (20) years each with five of those sentences to be consecutive and the remainder to be concurrent.

[¶ 11.] Smith appeals raising the following issues:

1. Whether the trial court erred in permitting "other bad acts" testimony by allowing DNA evidence showing Smith was the father of N.F.'s child.

2. Whether the indictment failed to adequately apprise Smith of the crimes charged in violation of his right to due process.

3. Whether the trial court erred in denying Smith's motion to suppress statements he made to law enforcement officers.

4. Whether the prosecutor committed prosecutorial misconduct in the closing arguments.

## ANALYSIS AND DECISION

[¶ 12.] **1. Whether the trial court erred in allowing "other bad acts" testimony by allowing DNA evidence showing Smith was the father of N.F.'s child.**

[¶ 13.] We recently stated our standard of review for a trial court's evidentiary rulings in *Veeder v. Kennedy:*

Evidentiary rulings made by the trial court are presumed correct and are reviewed under an abuse of discretion standard. *State v. Oster,* 495 N.W.2d 305, 309 (S.D.1993). The test is not whether we would have made the same ruling, but whether we believe a judicial mind, in view of the law and the circumstances, could have reasonably reached the same conclusion. *State v. Rufener,* 392 N.W.2d 424, 426 (S.D.1986).

*Veeder v. Kennedy*, 1999 SD 23, ¶ 41, 589 N.W.2d 610, 619 (citing *State v. Goodroad*, 1997 SD 46, ¶ 9, 563 N.W.2d 126, 129).

[¶ 14.] The trial court admitted "[N. F.'s] sexual relations (consisting of sexual contact and sexual intercourse) from the time that it first began up to and including the acts immediately preceding the acts charged." Smith claims the trial court abused its discretion when it admitted into evidence this "other bad acts" evidence, and in particular the DNA results, which showed Smith to be the father of N.F.'s child. Because N.F. was impregnated in Colorado, Smith claims the results of the DNA test are not admissible under SDCL 19–12–5 (FedREvid 404(b)).

[¶ 15.] The trial court properly reviewed the 404(b) request by (1) making a determination as to the relevance of the prior acts evidence to a material issue in the case and identifying the specific criteria which are the basis for its admission and (2) weighing the probative value of the evidence against its prejudicial effect. *State v. Moeller*, 1996 SD 60, ¶ 13, 548 N.W.2d 465, 472; *State v. Ondricek*, 535 N.W.2d 872, 873 (S.D.1995).

[¶ 16.] "[E]vidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence" is relevant. SDCL 19–12–1; *see also State v. McDonald*, 421 N.W.2d 492, 494 (S.D. 1988). The trial court admitted the prior acts evidence for the specific limited purpose of: "disclosing the relationship between the parties, the opportunity and inclination of the Defendant to commit the acts complained of in the indictment, and to corroborate the charges."

[¶ 17.] The State must prove each and every element of both rape and sexual contact, which included the identity of the perpetrator. *Thibodeau v. State*, 298 N.W.2d 818, 819 (S.D.1980). Evidence that is relevant to the charge of sexual contact is that of the alleged perpetrator's intent. *State v. Champagne*, 422 N.W.2d 840, 843 (S.D.1988). When considering the sexual contact charge, the State must prove beyond a reasonable doubt that the perpetrator's intent was to "arouse or produce sexual gratification" in himself or his victim. *Id.*

[¶ 18.] In *State v. Sieler*, 397 N.W.2d 89 (S.D.1986), we upheld admission of prior sexual acts perpetrated by a father upon a daughter. We did so because in part the prior acts identified a "course of continuous criminal action." *Id.* at 93. It was probative towards defining the nature of the family relationship. Likewise in *State v. Roden*, 380 N.W.2d 669 (S.D.1986), we upheld prior bad acts evidence which allowed admission of evidence that the defendant, who was charged with rape of a fourteen-year-old girl who resided in defendant's household, had on previous occasions repeatedly raped a stepdaughter under similar circumstances. We allowed the admission of this evidence on the grounds it defined the relationship of the defendant to young girls in his household. *Id.* at 671. Admission of prior bad acts is not limited to those instances listed in the statute as it uses the prefatory phrase "for other purposes." *State v. Dale*, 439 N.W.2d 98, 109 (S.D.1989). Admission of this prior bad acts evidence for the reasons set forth by the trial court is a "purpose" under this statute. *Sieler*, 397 N.W.2d at 93; *Roden*, 380 N.W.2d at 671.

[¶ 19.] After making its finding of relevance and identifying which criteria justify its admission, the trial court engaged in the balancing process of ascertaining whether the "danger of unfair prejudice substantially outweighs the probative value of the 'evidence in view of the availability of other means of proof' and other factors under SDCL 19–12–3 (Rule 403)." *State v. White*, 538 N.W.2d 237, 243 (S.D. 1995). Prejudice does not mean infliction of damage to the opponent's case that results from the legitimate probative force from the evidence; rather, it refers to the

capacity of the evidence to persuade the jury by illegitimate means. *State v. Iron Shell,* 336 N.W.2d 372, 375 (S.D.1983) (quoting 22 C. Wright & K. Graham, *Federal Practice and Procedure* § 5215 at 274–75 (1978)). Under SDCL 19–12–3 the evidence is admitted unless the trial court finds that the probative value is substantially outweighed by the danger of unfair prejudice. *Lykken v. Class,* 1997 SD 29, ¶ 24, 561 N.W.2d 302, 308. *See also* J. Larson, *South Dakota Evidence* § 403.1 (1991). Per SDCL 19–12–3 in order to exclude the evidence, the danger of unfair prejudice must not only outweigh the probative value, and it must outweigh it substantially. *State v. Rhines,* 1996 SD 55, ¶ 94, 548 N.W.2d 415, 440; *White,* 538 N.W.2d at 243.

[¶ 20.] A significant factor in balancing probative versus prejudicial is factual similarity. *Moeller,* 1996 SD 60, ¶ 27, 548 N.W.2d at 475. We have focused on two important criteria: (1) similar victims, and (2) similar crimes. *See State v. Christopherson,* 482 N.W.2d 298, 301–02 (S.D. 1992); *State v. Werner,* 482 N.W.2d 286, 289–90 (S.D.1992); State v. Perkins, 444 N.W.2d 34, 38 (S.D.1989). Here the victim is the same for the prior bad acts and the charged offenses. There is no other victim involved in the prior acts evidence. The offenses are identical, rape and sexual contact. The only difference is the prior acts occurred in Colorado and Wisconsin while the charges before us are alleged to have occurred in Lawrence County, South Dakota. Geography and political boundaries are a distinction without a difference in cases such as this. *See Sieler,* 397 N.W.2d 89 (prior bad acts occurred in Michigan).

[¶ 21.] Another consideration in the potential admission of 404(b) evidence is the availability of other evidence. *White,* 538 N.W.2d at 243. The record before us reveals on both the rape and sexual con-tact charges, there was no third party witnesses, semen, medical evidence or other physical evidence to establish the crimes occurred. This heightens the probative value of the prior bad acts. *Id.* Werner, 482 N.W.2d at 290. *See also United States v. Ingraham,* 832 F.2d 229, 236–7 (1st Cir.1987), *cert. denied,* 486 U.S. 1009, 108 S.Ct. 1738, 100 L.Ed.2d 202 (1988).

[¶ 22.] The trial court also gave the appropriate cautionary instruction setting forth the limited purpose for which the evidence was admitted. It must be presumed the jury followed the court's instruction. *State v. Lowther,* 434 N.W.2d 747, 753–54 (S.D.1989).

[¶ 23.] We conclude that the trial court did not abuse its discretion in admission of the prior acts evidence.

**[¶ 24.] 2. Whether the indictment failed to adequately apprise Smith of the crimes charged in violation of his right to due process.**

[¶ 25.] "An indictment is sufficient if it 'contains the elements of the offense charged such that it apprises the defendant with reasonable certainty of the accusations against him, and it must enable him to plead an acquittal of conviction as a bar to future prosecutions for the same offense.'" *State v. Darby,* 1996 SD 127, ¶ 8, 556 N.W.2d 311, 315 (citing *State v. Floody,* 481 N.W.2d 242, 246 (S.D.1992); *State v. Basker,* 468 N.W.2d 413, 416 (S.D. 1991); *Accord State v. Wurtz,* 436 N.W.2d 839, 843 (S.D.1989); *State v. Logue,* 372 N.W.2d 151, 155 (S.D.1985); *State v. Swallow,* 350 N.W.2d 606, 608 (S.D.1984)). The indictment was framed as a series of five counts each, worded the same except for the month, which advanced from September 1994 through January 1995.[3]

---

3. For example:
Count I: RAPE
That on or about the month of September, 1994, in the County of Lawrence, State of South Dakota, Bruce Edgar Smith Sr., D.O.B. 6–29–51, did accomplish an act of sexual penetration with another person, namely, [N.F.] ... through the use of force,

[¶ 26.] Smith claims the indictment was vague and lacked specificity. Because the indictment did not list exact times or places "his hands were figuratively tied" and "he could not provide an alibi defense or develop his witness." He complains since N.F. claimed he raped her forty to fifty or more times a month, she should be able to identify some days with certainly. At trial, N.F. claimed he had raped her so many times that the incidents began to blend together in her mind.

 [¶ 27.] SDCL 23A–6–9 provides:

The precise time at which an offense was committed need not be stated in an indictment or information, but it may be alleged to have been committed at any time before the filing thereof, except when the time is a material element of the offense.

It is settled law that the time of the occurrence is not a material element in rape as the elements of the offense are not "time dependent." *Darby*, 1996 SD 127, ¶ 10, 556 N.W.2d at 316. *See also Floody*, 481 N.W.2d at 247; *Basker*, 468 N.W.2d at 416; *Wurtz*, 436 N.W.2d at 842; *Swallow*, 350 N.W.2d at 608.

[¶ 28.] The indictment, which provided the month and the year, was sufficient. It contained the elements of the crimes charged to adequately appraise Smith of the charges against him and would allow him to plead an acquittal to bar future prosecutions. We affirm.

[¶ 29.] **3. Whether the trial court erred in denying Smith's motion to suppress statements he made to law enforcement officers.**

[¶ 30.] We recently stated our standard of review for a trial court's ruling on a motion to suppress:

A trial court's findings of fact from a suppression hearing must be upheld un-

less they are clearly erroneous.... This court's function under the clearly erroneous standard is to determine whether the decision of the lower court lacks the support of substantial evidence, evolves from an erroneous view of the applicable law or whether, considering the entire record, we are left with a definite and firm conviction that a mistake has been made. In making this determination, we review the evidence in a light most favorable to the trial court's decision.

*State v. Meyer*, 1998 SD 122, ¶ 16, 587 N.W.2d 719, 722–3 (citing *State v. Benallie*, 1997 SD 118, ¶ 10, 570 N.W.2d 236, 238 (citing *State v. Dreps*, 1996 SD 142, ¶ 8, 558 N.W.2d 339, 341) (citation omitted))).

[¶ 31.] *a. September 18, 1996 statement*

 [¶ 32.] Smith claims the statements made at the November 18, 1996 interview were coerced. Therefore, he argues the trial court should have granted his motion to suppress. He claims he only participated in the November 18th interview because the officers were threatening his wife. He also alleges that in the course of this same interview the two officers used "psychological coercion," "speaking warmly and confidentially to Smith" and "implying that the act of intercourse with a family member is the product of a normal sex drive, something they see all the time ... assuring defendant that he is normal and not a bad person for having sex with [N.F.]."

[¶ 33.] Smith was given the *Miranda* warning prior to the interview. The one statement that Smith made during the interview involves a dream sequence in which Smith related the dream to the officers. He told them he dreamed he woke up in bed next to his stepdaughter and

coercion or threats of immediate and great bodily harm against the victim accompanied by apparent power of execution. Contrary to SDCL 22–22–1(2).

Each count or alternative counts had the exact format, with the exception of the dates or the crime charged.

both of them were naked.[4] Smith's motion to suppress this statement was denied and it was presented during trial.

[¶ 34.] *b. February 26, 1997 statement*

[¶ 35.] The second statement at issue is the one made on February 26, 1997. On this date Smith had gone to the Sheriff's Office to provide them with a blood sample for DNA testing. After he was given his *Miranda* warning he told the officers that he did not have anything else to say to them. The officers did not ask any more questions. While he was walking down the hallway of the Sheriff's Office, Smith spontaneously blurted out "What am I going to do if I am the father of that child?" The trial court found that this statement was unsolicited by law enforcement and completely voluntary. The statement was admitted.

[¶ 36.] An involuntary or coerced admission will be suppressed due to its inherent unreliability. *State v. Smith*, 1998 SD 6, ¶ 7, 573 N.W.2d 515, 517. When we examine claims of involuntariness of an admission on appeal by considering "the effect the totality of the circumstances had upon the will of the defendant and whether the defendant's will was overborne." *Smith*, 1998 SD 6, ¶ 8, 573 N.W.2d at 517 (citing *State v. Thompson*, 1997 SD 15, ¶ 29, 560 N.W.2d 535, 541–42 (citing *Darby*, 1996 SD 127, ¶ 28, 556 N.W.2d at 319; *State v. Dickey*, 459 N.W.2d 445, 447 (S.D.1990))). Factors that we will examine include:

1) the defendant's age; 2) the defendant's lack of education or low intelligence; 3) the absence of any advice to the defendant of his constitutional rights; 4) the length of detention; 5) the repeated and prolonged nature of questioning; and 6) the use of physical punishment such as deprivation of food or sleep. A defendant's prior experience with law enforcement officers and the courts is also a factor this Court considers. The question is not whether the interrogators' statements were the cause of the confession but whether those statements were so manipulative or coercive that they deprived [a defendant] of his ability to make an unrestrained, autonomous decision to confess.

*Smith*, 1998 SD 6, ¶ 8, 573 N.W.2d at 517 (internal citations omitted).

[¶ 37.] The interview and the spontaneous statement, which were the subject of the motion to suppress and this appeal, both took place at the Lawrence County Sheriff's Office. The record shows that at the time of the interview and the subsequent blood sample, Smith was in his late 40s. Although the record does not reflect his educational level, he had previous experience dealing with law enforcement and the judicial system. There was no absence of any advice to Smith in regards to his constitutional rights. On both occasions he was given the *Miranda* warning, signed a card indicating he had been given the *Miranda* warning and during the blood sample he chose to invoke his rights. During the September interview he was only detained for approximately two hours and chose to speak to the officers saying he had "nothing to hide." At the subsequent blood sample taking in February, he was only detained long enough to take the sample. The February statement was spontaneously blurted out. On neither occasion was he deprived of food or sleep. The

---

4. Smith: I had a dream, that I can't say is for real, okay, but I had a dream because [N.F.] was accusing me of this shit. I, this is when we lived over here, before we moved back over to the motel, um, so I asked Doris, I go, did we ever have sex, [N.F.] and I? And she goes, no, you never had sex with her, did you? I had a dream and you know because I, N.F. had been picked up and dropped over here, and she'd accused me of beating her up.

Officer: Ah-hah.
Smith: And it wasn't true. I had no way to handle her, even the cop wrote it that way, and but that night I'd had a dream. Her and I gone to bed. I was drunk and that has bugged me ever since. Because granted now, I was willing to give her my name, you know, she was my daughter.

allegations that officers threatened his wife are unfounded. Furthermore, the November encounter was conversational and polite. Smith chatted with the officers about his son's Camero and the weather. He was not denied "his ability to make an unrestrained, autonomous decision to confess."[5] The trial court did not err in admitting these statements.

### [¶ 38.] 4. Whether the prosecutor committed prosecutorial misconduct in closing arguments.

[¶ 39.] We review a court's evidentiary rulings under the abuse of discretion standard. *State v. Spiry*, 1996 SD 14, ¶ 11, 543 N.W.2d 260, 263 (citations omitted). An evidentiary ruling will not be overturned unless error is "demonstrated ... [and] shown to be prejudicial error." *Id.* (Quoting *Shaffer v. Honeywell, Inc.*, 249 N.W.2d 251, 258 (S.D.1976)). Error is prejudicial when, "in all probability ... [it] produced some effect upon the final result and affected rights of the party assigning it." *Id.* (quoting *K & E Land and Cattle, Inc. v. Mayer*, 330 N.W.2d 529, 533 (S.D. 1983)).

[¶ 40.] "Prosecutorial misconduct implies a dishonest act or an attempt to persuade the jury by use of deception or by reprehensible methods." *State v. Davi*, 504 N.W.2d 844, 855 (S.D.1993) (citing *State v. Ashker*, 412 N.W.2d 97, 103 (S.D. 1987)). We will reverse only if the violation has prejudiced the party or denied the party a fair trial. *State v. Hofman*, 1997 SD 51, ¶ 13, 562 N.W.2d 898, 902 (citing *Robbins v. Buntrock*, 1996 SD 84 ¶ 6, 550 N.W.2d 422, 425).

[¶ 41.] Smith claims in closing arguments the prosecutor deliberately inflamed the passions of the jurors. During closing arguments, the prosecutor called Smith a "monster ... something scarier than anybody dressed up on Halloween." The prosecutor repeatedly stated Smith was a "sexual predator," a "tyrant in his own home," that Smith "was not human," a "pervert" and a "child molester." He also claimed that Smith, "took away N.F.'s dignity," "[h]e betrayed her trust," "[h]e dominated N.F.," "[he] did not treat N.F. like a human being, let alone a child or let alone a daughter." He stated Smith "got his kicks forcing sex on a child." He said Smith had "impregnated his stepdaughter when she was 13 years old and gave her his disease."[6] The prosecutor argued N.F. was a "prisoner of war," Smith had "held her captive," and she had been "turned into a robot." Counsel for the defendant repeatedly objected to the prosecutor's inflammatory statements. The trial court sustained the objections and instructed the jury to disregard the prosecutor's comments. Smith now claims the cumulative effects of the prosecutor's inflammatory closing argument denied him his right to a fair trial.

[¶ 42.] "It is well established ... that the prosecutor and the defense have considerable latitude in closing arguments, for neither is required to make a colorless argument." *State v. Smith*, 541 N.W.2d 584, 589 (Minn.1996). Counsel has a right to discuss the evidence and inferences and deductions generated from the evidence presented. *State v. Reynolds*, 120 Idaho 445, 816 P.2d 1002, 1006 (Idaho App.1991). However, our cases have held fast to the idea that "[t]he prosecutor has an overriding obligation, which is shared with the court, to see that the defendant receives a fair trial." *State v. Blaine*, 427 N.W.2d 113, 115 (S.D.1988) (citing *State v. Brandenburg*, 344 N.W.2d 702 (S.D.1984)).

---

**5.** In the November interview Smith did not give any inculpatory statement. He denied ever having a sexual relationship with N.F. throughout the entire interview. He only stated that he once had a dream he had slept with N.F. It is questionable as to whether this "confession" may be ruled involuntary when he has said nothing inculpatory. *State v. Corder*, 460 N.W.2d 733, 737 (S.D.1990).

**6.** There is information in the record that Smith and his wife had a sexually transmitted disease.

He or she may not seek a conviction at any price. *State v. Porter*, 526 N.W.2d 359, 362–3 (Minn.1995). The question then is when does the prosecutor's argument cross the line of colorful argument and become misconduct?

### [¶ 43.] *a. Prosecutorial misconduct*

■ [¶ 44.] In South Dakota, we approach prosecutorial misconduct using a two-prong analysis. First, we must determine that the misconduct occurred. *Hofman*, 1997 SD 51, ¶ 13, 562 N.W.2d at 902 (citing *Robbins*, 1996 SD 84, ¶ 6, 550 N.W.2d at 425). If misconduct did occur, we will reverse the conviction only if the misconduct has prejudiced the party as to deny him or her a fair trial.[7] *Id.*

### [¶ 45.] *i. Misconduct*

■ [¶ 46.] What may a prosecutor do in closing arguments? He or she may "discuss the evidence, pointing out discrepancies and conflicts in the testimony, and argue that the evidence in the record supports and justifies a conviction .... [he or she] may make remarks, not based on the record, which concern matters of general knowledge or experience." *Reynolds*, 816 P.2d at 1007 (citing ABA Standard § 5.9). A crime involving outrageous conduct may warrant stronger words against the accused in the closing arguments than might otherwise be justified. *Id.* at 1008. The prosecutor may cross the line when he or she injects "unfounded or prejudicial innuendo into the proceedings ... [or appeals] to the prejudices of the jury." *Blaine*, 427 N.W.2d at 115 (citation omitted). We must now determine if the complained of conduct was misconduct committed by the prosecutor.

[¶ 47.] In order to determine whether misconduct occurred we can look to persuasive authority from other jurisdictions. In *Porter*, the Minnesota Supreme Court found that misconduct permeated the prosecutor's entire closing argument. 526 N.W.2d at 365. In closing arguments, the prosecutor stated that if the jury acquitted the defendant they would be "suckers" and if they believed the defendant's wife's testimony then he had "time share in Santa Claus's condo at the north pole, and [would] sell you some." *Id.* at 363. He also repeatedly referred to the "James Porter School of Sex Education" several times during the closing arguments.[8] *Id.* The Court labeled the prosecutor's statements as misconduct that "struck at the heart of the jury system, juror independence." *Id.* at 365.

■ [¶ 48.] Closing arguments are not evidence. The argument should be no more than an accurate summary of the state of the evidence. *State v. Nachtigall*, 296 N.W.2d 530, 531–2 (S.D.1980) (citing *State v. Winckler*, 260 N.W.2d 356 (S.D. 1977). *See also People v. Hopkins*, 52 Ill.2d 1, 284 N.E.2d 283 (1972)). Juries are presumed to follow the trial court's instruction that the attorneys' final arguments do not constitute evidence. However, unfair closing arguments invite a jury decision by emotion rather than by evidence. This improper type of argument cuts to the heart of juror independence.

■ [¶ 49.] The prosecutor's penchant for making statements meant to inflame the passion of the jury and go outside the realm of admissible evidence, is an example of the unprofessional, "win-at-all costs"

---

7. The majority of jurisdictions would not reverse a conviction even though prosecutorial misconduct occurred unless there was prejudice or error that was not harmless. *Porter*, 526 N.W.2d at 365. (Where misconduct has been established, the court will not reverse unless the defendant has been denied a fair trial); *Williams v. State*, 103 Nev. 106, 734 P.2d 700 (1987). (If prosecutorial conduct is harmless, it does not justify reversal); *Mathis*

*v. U.S.*, 513 A.2d 1344, 1349 (D.C.1986). (If prosecutorial misconduct is found, this Court will reverse only when the errors rise to the level of "substantial prejudice").

8. Porter had been charged with sexually molesting S.M.D. However, there existed a number of allegations he sexually molested children when he was a priest.

attitude that scars the judicial system. In this case, the prosecutor's statements in closing arguments border on the outrageous. Nothing necessitated these comments, especially considering the strong evidence against Smith. Although the prosecutor "may prosecute with earnestness and vigor .... [and] he may strike hard blows, he is not at liberty to strike foul ones." *Blaine*, 427 N.W.2d at 116 (citing *Viereck v. United States*, 318 U.S. 236, 248, 63 S.Ct. 561, 566–67, 87 L.Ed. 734, 741 (1943)). Calling Smith a "monster" or a "pervert" was a foul blow, abhorrent and misconduct. .

[¶ 50.] There is further authority in the South Dakota Rules of Professional Conduct that would allow us to label the prosecutor's act as misconduct. Under the South Dakota Rules of Professional Conduct, a prosecutor's has "the responsibility of a minister of justice and not simply that of an advocate." *See* Rule 3.8, cmt. Furthermore, it is professional misconduct if a lawyer engages in conduct that is prejudicial to the administration of justice. *See* Rule 8.4(d).[9] The conduct of the prosecutor in this case was in derogation of the administration of justice.[10]

[¶ 51.] *ii. Prejudice*

[¶ 52.] In South Dakota, due process does not guarantee a defendant the right to an error-free trial, neverthe-less it must be a fair trial. Prosecutorial misconduct reaches the level of a federal constitutional violation only if the argument "so infect[s] the trial with unfairness as to make the resulting convictions a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974).

[¶ 53.] While an error has been demonstrated it has not been shown to be a prejudicial error. *Spiry*, 1996 SD 14, ¶ 11, 543 N.W.2d at 263. In all probability it is very unlikely the prosecutor's inflammatory statements altered the jury's verdict. This is particularly true when considering the overwhelming evidence that Smith committed the crimes of which he was charged. As Smith has failed to show prejudicial error, we affirm.

[¶ 54.] KONENKAMP, Justice, concurs with a writing.

[¶ 55.] MILLER, Chief Justice, concurs on Issues 1–3 and concurs in result without a writing on Issue 4.

[¶ 56.] AMUNDSON, Justice, concurs in part and dissents in part.

[¶ 57.] SABERS, Justice, dissents.

KONENKAMP, Justice (concurring).

[¶ 58.] If I thought retrying this case would serve only to chasten the prosecutor

9. SDCL 16–16–18 sets forth the oath required of attorneys to practice law in South Dakota. It provides in part:

> I will abstain from all offensive personality, and advance no fact prejudicial to the honor or reputation of a party or witness, unless required by the justice of the cause with which I am charged[.]

Here the outrageous comments of the prosecutor were not required for the "justice of the cause with which [he] was charged." Instead, it came perilously close to snatching defeat from the jaws of evidentiary victory. In *Black v. Class*, 1997 SD 22, ¶ 29, 560 N.W.2d 544, 551–2, we set forth the overall result of a prosecutor failing to properly execute the duties of office when representing the State at trial:

> The result? The defendant has been incarcerated since 1991 for a death which may or may not be found to be justifiable self-defense when all relevant facts are considered. Prosecutors and law enforcement will be required to again put forth substantial time to prepare for retrial as will the defense. The public is forced to underwrite the expense of a re-trial.

In addition, public confidence in the fairness and finality of the judicial system may be the ultimate victim.

10. As previously noted here the attorney for the defendant entered timely objections. Should defense counsel in other cases fail to be so diligent, given the ethical considerations involved, the trial court certainly is well within its function to halt such unjustified comments on its own motion. *Blaine*, 427 N.W.2d at 115.

for his uncivil remarks, I might vote to reverse. If I thought the jury probably would have acquitted but for those comments, I would certainly vote to reverse. Yet I am satisfied these disparagements made no difference in the outcome and offended none of the defendant's substantial rights. Smith told police that his stepdaughter was a liar, that she made up in her mind the rapes she described. However, he fathered a child by her! He denied that also, despite two DNA tests proving his paternity. In the end, he claimed he did not know how the baby could be his. Understandably, the jury found no reasonable doubt of guilt. Let us not overlook that this case was well and fairly tried, except for the transgressions in closing argument.

[¶ 59.] Nonetheless, I regret the invective brought down on Smith. No one should be denounced in court with such dehumanizing words. To preserve humanity, after all, is why we have law. People are more than the crimes they commit. They may act monstrously, but they are not monsters. Surely, though, there are better and more immediate ways for dealing with misconduct in the courtroom than ordering a retrial after appeal. To send this case back for another trial, to put this victim through the entire ordeal again, not because we doubt the verdict, but only to admonish the prosecutor, seems to me insupportable.

[¶ 60.] This is not an instance where the trial judge abridged the process, either by ignoring misbehavior, or worse, by overruling objection to it. In those cases, litigants have no recourse. Here, the judge sustained defense objections and instructed the jury to disregard the prosecutor's remarks. Perhaps the judge could have gone further and imposed sanctions; presumably, if the problem occurs again, he will. From my standpoint, a trial judge's on-the-scene supervision is the most effective means for controlling adversarial excess.

[¶ 61.] In cases of flagrant misbehavior, either by the prosecutor or the defense attorney, a judge should intervene without waiting for an objection. Opposing counsel ought not to be saddled with the entire burden of upholding the honor of our system. Under our judicial ethics, judges "shall require order and decorum in proceedings." Code of Judicial Conduct, Canon 3(b)(3). Not only must they "be patient, dignified and courteous" themselves, judges must also "require similar conduct of lawyers...." Canon 3(b)(4). In deciding what action to take—a warning, a special instruction to the jury, a sanction, or a mistrial—the trial judge should consider (a) the bad faith nature of the argument; (b) whether the misconduct was repeated; (c) the argument's effect on the jury; and (d) whether the "improper argument bolsters an otherwise weak case." Rosemary Nidiry, *Restraining Adversarial Excess in Closing Argument,* 96 Colum.L.Rev. 1299, 1330 (1996)(quoting J. Alexander Tanford, *Closing Argument Procedure,* 10 Am.J.Trial Advoc. 47, 103 (1986)).

[¶ 62.] As an appellate court reviewing the dead record, we face a fearful dilemma. We must choose between competing principles: deterring prosecutorial misconduct or sustaining as final a case of convincing guilt. Here, I choose finality, though I acknowledge the choice is uncomfortable. Either way, the integrity of our justice system is at stake. Yet, each case must be considered on its individual merits. Reviewing courts typically examine: (1) the prejudicial impact of the statements, (2) the effectiveness of any cautionary instruction, and (3) the strength of the evidence against the defendant. *See, e.g., United States v. Saenz,* 747 F.2d 930, 939 (5thCir.1984) (quoting *United States v. McPhee,* 731 F.2d 1150, 1152 (5thCir.1984)), *cert. denied sub nom. Solis v. United States,* 473 U.S. 906, 105 S.Ct. 3531, 87 L.Ed.2d 655 (1985); *United States v. Rhoden,* 453 F.2d 598, 599–600 (5th Cir. 1972), *cert. denied,* 406 U.S. 947, 92 S.Ct. 2050, 32 L.Ed.2d 334 (1972). Despite the

nature of the prosecutor's comments, these factors support affirmance.

[¶ 63.] I hold with Learned Hand's judicial view that governance is best attained with persuasion, rather than coercion, although sometimes the latter is necessary. Today let the matter end here with the reminder that we who serve the law also serve as examples. Civility is no virtue if it must be enforced like a code. It means more than mere adherence to rules, more than minding the niceties of etiquette. It means, as Justice Anthony Kennedy lately remarked, "respect for the dignity and worth of a fellow human being."

AMUNDSON, Justice (concurring in part and dissenting in part).

[¶ 64.] I concur on issues one, two and three.

[¶ 65.] On issue four, I agree with the majority's conclusion that this record discloses prosecutorial misconduct in the closing arguments. However, I disagree that this does not result in reversible error. The majority's opinion, once again, evinces the position taken in other cases reviewed by this Court that if the evidence is overwhelming, do not worry about appellate review. There comes a time when rhetoric which merely expresses dissatisfaction is inadequate to effectively get the message across.

[¶ 66.] Judge Frank, dissenting in *United States v. Antonelli Fireworks Co.*, 155 F.2d 631, 661 (2ndCir.1946), expressed exasperation in dealing with improper prosecutorial argument:

> This court has several times used vigorous language in denouncing government counsel for such conduct as that of the United States Attorney here. But, each time, it has said that, nevertheless, it would not reverse. Such an attitude of helpless piety is, I think, undesirable.... If we continue to do nothing practical to prevent such conduct, we should cease to disapprove it.... Government counsel, employing such tactics, are the kind who, eager to win victories, will gladly pay the small price of a ritualistic verbal spanking. The practice of this court – recalling the bitter tear shed by the Walrus as he ate the oysters – breeds a deplorably cynical attitude towards the judiciary.

[¶ 67.] In my opinion, the verbal spankings of the past have fallen on deaf ears. When a prosecutor steps outside the bounds of the appropriate adversarial role in final argument to the jury, there should be a price to pay.

[¶ 68.] The Eighth Circuit Court of Appeal's decision in *United States v. Cannon*, 88 F.3d 1495, 1502 (8thCir.1996), established the price when it reversed a conviction for improper closing argument. The court held:

> Referring to defendants as "bad people" simply does not further the aims of justice or aid in the search for truth, and is likely to influence bias in the jury and to result in a verdict based on something other than evidence. Therefore, the remarks were highly improper.

[¶ 69.] In this case, we have even more outrageous statements than merely claiming defendant to be a bad person. Therefore, I cannot join the "ritualistic verbal spanking" of the majority. To do so ignores the duty incumbent upon a prosecutor "not simply to prosecute, but to obtain justice with a fair trial." *State v. Wiegers*, 373 N.W.2d 1, 11 (S.D.1985); *State v. Brandenburg*, 344 N.W.2d 702, 705 (S.D. 1984). Therefore, I would reverse on this issue.

SABERS, Justice (dissenting).

[¶ 70.] I agree in spirit with Justice Konenkamp's writing. However, this is the second time this prosecutor's actions are an issue on appeal. *See State v. Stetter*, 513 N.W.2d 87, 90 (1994). *See also id.* at 96–97 (Amundson, J., dissenting).

[¶ 71.] Therefore, I join Justice Amundson's dissent on issue four.